Sophia STEWART, Plaintiff,

v.

Andy WACHOWSKI, et al., Defendants.

No. CV 03–2873 MMM (VBKx).

United States District Court,
C.D. California.

June 14, 2005.

Order Denying Reconsideration
March 27, 2006.

Michael Thomas Stoller, Michael T. Stoller Law Offices, Beverly Hills, CA, for Plaintiff.

Robert A. Wyman, Bruce Isaacs, David H. Boren, Janna Smith, Wyman & Isaacs, Beverly Hills, CA, for Defendants.

## ORDER GRANTING THE TERMINATOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND THE MATRIX DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, District Judge.

Plaintiff Sophia Stewart alleges that defendants Twentieth Century Fox Film Corporation, James Cameron and Gale Anne Hurd (collectively, the "Terminator Defendants") willfully infringed her copyrighted literary works by making and distributing The Terminator ("Terminator 1"), Terminator 2: Judgment Day ("Terminator 2") and Terminator 3: Rise of the Machines ("Terminator 3").[1] Stewart similarly alleges that defendants Warner Bros. Entertainment, Inc., Andy Wachowski, Larry Wachowski, Joel Silver, and Thea Bloom (collectively, the "Matrix Defendants") willfully infringed her copyrighted literary works by making and distributing The Matrix ("Matrix 1"), The Matrix Reloaded ("Matrix 2"), and The Matrix Revolutions ("Matrix 3").[2] Stewart asserts claims for copyright infringement, declaratory relief, and violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961, et seq.[3] In separately filed motions, the Terminator Defendants and the Matrix Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The court addresses both motions in this order.

---

1. Second Amended Complaint ("Complaint"), ¶ 64.

2. *Id.*

3. *Id.,* ¶¶ 66–131.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Stewart's Copyrighted Works

Virtually every fact in this action is disputed. Plaintiff Sophia Stewart is a screenwriter who works under the pseudonyms Zenia Kavala[4] and Sonya Stewart.[5] Stewart's complaint alleges that, on or about May 1, 1981, she created a six-page screen treatment titled "The Third Eye," which was a "scientific account of futuristic life."[6] It further alleges that, on or about November 1, 1983, Stewart created a "45-page instrument" titled "The Third Eye."[7] The complaint identifies the title of both works as "The Third Eye" rather than "Third Eye." Stewart registered a copyright in the six-page treatment on February 2, 1983, and a copyright in the 45-page instrument on February 6, 1984.[8]

### B. Allegations Against The Terminator Defendants

Stewart asserts that, in May 1981, she mailed the six-page treatment to Susan Merzback, Vice–President of Creative Affairs for Twentieth Century Fox Film Corporation.[9] She also contends that, in response to an October 1983 telephone call from Fox seeking submission of the completed work, she mailed the completed manuscript to Fox's David Madden.[10] For the next year and a half, Stewart and her agent, Ester Duffie, purportedly communicated with Fox employees, and made several attempts to submit the manuscript for the studio's consideration. Fox allegedly advised Stewart by mail that it could not accept the manuscript unless it was submitted by an agent registered with the Writer's Guild of America.[11]

Stewart contends that James Cameron and Gale Ann Hurd "act[ed] in concert with Twentieth Century [Fox]" in releasing Terminator 1, Terminator 2, and Terminator 3. She alleges that Fox was an investor in each of the Terminator films, and that it had a role in writing, producing and distributing them.[12] She further asserts that each infringes her copyrighted works.[13]

The Terminator Defendants counter that no person connected with the creative process that led to production of the Terminator films—including Cameron and Hurd—had access to Stewart's "Third Eye" literary materials.[14] Although they concede that Fox had access to the Third Eye materials in the 1980's, defendants assert that Fox was not involved in creating or producing Terminator 1, 2, and 3.[15] Defendants also contend that neither Cameron nor Hurd had any relationship with Fox until after the release of Terminator 1,[16] and that Cameron completed the Terminator 1 screenplay in October 1982,[17]

---

4. *Id.,* ¶ 2.

5. See *id.,* Exh. 4 at 2.

6. *Id.,* ¶ 16; The Terminator Defendants' Motion For Summary Judgment ("Terminator Defs.' Mot.") at 5; The Matrix Defendants' Motion For Summary Judgment ("Matrix Defs.' Mot.") at 5.

7. Complaint, ¶ 17.

8. *Id.,* ¶ 2, Exhs. 1, 3.

9. *Id.,* ¶ 19.

10. *Id.,* ¶ 21.

11. *Id.,* ¶¶ 21–23.

12. *Id.,* ¶ 53.

13. *Id.,* ¶¶ 50–52.

14. Statement of Uncontroverted Facts And Conclusions Of Law As Submitted By The Terminator Defendants ("Terminator Defs.' Facts"), ¶¶ 1–4.

15. *Id.,* ¶ 5.

16. *Id.,* ¶¶ 8, 9.

17. *Id.,* ¶ 14.

before Stewart finished the Third Eye manuscript. Finally, defendants assert that Stewart's claims fail because she cannot establish that her works are substantially or strikingly similar to Terminator 1, 2, and 3.[18]

## C. Allegations Against The Matrix Defendants

As respects the Matrix Defendants, Stewart alleges that, in the summer of 1986, she sent her six-page treatment and 45-page instrument to Andy and Larry Wachowski in response to an advertisement in a national magazine seeking works of science fiction.[19] Stewart asserts that, although the Wachowskis received the submission, they did not contact her or return the copyrighted works.[20]

In March 1999, the Wachowskis, allegedly "acting in concert with Silver, Warner Bothers and Bloom," produced and distributed a film and comic book series titled "The Matrix."[21] That same month, Stewart allegedly discovered that the film and comic book series infringed her copyrights in the treatment and the 45-page instrument.[22] As a result, she communicated with Warner Brothers and the Wachowskis, demanding that they cease their infringing activities.[23] Stewart asserts that she continued to correspond with Warner Brothers about her claim through February 2001.[24] She contends that the Wachowskis, "acting in concert with Silver, Warner Brothers and Bloom," released Matrix 2 and Matrix 3 as sequels, and that each was based on her copyrighted works.[25] On June 10, 1999, Stewart filed a written complaint with the Federal Bureau of Investigation, charging that the Wachowskis, Silver, Warner Brothers, and others had infringed her copyrights.[26] Apparently, she at some point also charged that Terminator 1, 2 and 3 infringed her copyrights.[27]

The Matrix defendants contend that the Wachowskis independently created Matrix 1, 2, and 3,[28] and that none of them had access to Stewart's Third Eye literary materials.[29] Defendants dispute Stewart's allegation that the Wachowskis placed an advertisement soliciting works of science fiction in a magazine in 1986, and further dispute that Stewart mailed her literary works to the Wachowskis.[30] Defendants assert that the purported similarities between the Third Eye literary materials

18. *Id.,* ¶¶ 19–20.

19. Complaint, ¶¶ 24–26.

20. *Id.,* ¶ 26.

21. *Id.,* ¶¶ 27–28.

22. *Id.,* ¶ 29.

23. *Id.,* ¶¶ 29, 31, 37.

24. *Id.,* ¶¶ 39–42, 45.

25. *Id.,* ¶¶ 46–47.

26. *Id.,* ¶ 43.

27. See Declaration of Sophia Stewart In Support Of Plaintiff's Opposition To The Terminator Defendants' Summary Judgment Mo-

tion ("Stewart Terminator Decl."), ¶ 8 (indicating that the FBI confirmed her suspicions that both the Matrix and Terminator trilogies were copied from her works). In a separate order, the court grants defendants' motion to preclude plaintiff's testimony pursuant to Rule 37(b)(2)(B) of the Federal Rules of Civil Procedure. Any references in this order to Stewart's declarations, therefore, are by way of background or in aid of an alternative ruling on the issues presented by defendants' motion.

28. Statement Of Uncontroverted Facts And Conclusions Of Law As Submitted By The Matrix Defendants ("Matrix Defs.' Facts"), ¶ 10.

29. *Id.,* ¶¶ 1–2, 9.

30. *Id.,* ¶¶ 3–5.

and the Matrix films do not rise to the level of protectable expression.[31] They also contend that the Third Eye literary materials are neither substantially nor strikingly similar to the Matrix films.[32]

## D. Identifying Stewart's Protected Materials

As a threshold matter, the court must determine which works constitute Stewart's copyrighted "Third Eye" literary materials. The operative complaint alleges:

"Stewart is the legal and beneficial federal copyright claimant, owner, and author of the following intellectual property: (1) 'The Third Eye,' United States Copyright Office Registration Number Txu 117–610, effective date of registration, **2 February 1983**, attached hereto and incorporated herein as **Exhibit 1;** (2) **'The Third Eye,'** which ... work was completed **1 May 1981**, attached hereto and incorporated herein as **Exhibit 2** (the work for the created epic manuscript was completed in **1983**, and includes the entire text (original story), the original treatment for a motion picture, which is the document referenced in **Exhibit 1**); (3) 'The Third Eye' (add on manuscript), United States Copyright Number Txu 154–281, **6 February 1984**, attached hereto and incorporated herein by reference as **Exhibit 3** (which includes the add on manuscript, by Sophia Stewart under her pseudonym Zenia Kavala, the original draft, graphic illustrations, character analysis, synopsis); and (4) **"The Makings of The Third Eye,"** which is attached hereto and in-

corporated herein by reference as **Exhibit 4."**[33]

The exhibits attached to the complaint do not track this allegation. Exhibit 1 is a copyright registration for a work titled "Third Eye" by Sophia Stewart. Exhibit 3 is a copyright registration for a work titled "Third Eye (Add-on Manuscript)" by Sophia Maciél Stewart/Zenia Kavala.[34] Exhibit 2 is the six-page treatment,[35] and Exhibit 4—which is identified in paragraph 2 as "The Makings of The Third Eye"—is in fact a 47–page manuscript accompanied by a table of contents, forward, preface and introduction.[36] Although the complaint alleges that " 'The Third Eye' (add on manuscript)" includes, *inter alia*, "the original draft, graphic illustrations, character analysis, [and] synopsis," none of the exhibits includes these items. Similarly, although the complaint states that a document titled "The Makings of The Third Eye" is attached, no exhibit bearing that title is included. Finally, although the complaint consistently refers to Stewart's works as "The Third Eye," the treatment and the 47–page manuscript attached as exhibits bear the title "Third Eye."

In her opposition to the pending motions, Stewart now contends that "there are three sets of documents which make up [her] protected literary works."[37] These are

1. "Third Eye" by Sophia Stewart consisting of a 6–page treatment.

2. "The Third Eye" by Zenia Kavala consisting of (i) a 2–page synopsis, (ii) a single page character list, (iii) a

---

31. *Id.,* ¶ 17.

32. *Id.,* ¶¶ 21–22.

33. Complaint, ¶ 2 (emphasis original).

34. *Id.,* Exhs. 1, 3.

35. *Id.,* Exh. 2.

36. *Id.,* Exh. 4. Although the last page of the manuscript is numbered 47, the manuscript starts with page 2. As a result, the document has 46 rather than 47 pages.

37. Plaintiff's Opposition To The Terminator Defendants' Motion For Summary Judgment ("Pl.'s Terminator Opp.") at 3.

2–page "character analysis," (iv) 5 pages of illustrations, (v) a single page outline of the manuscript titled "The Making of The Third Eye," (vi) and the "original" manuscript consisting of 29 pages of text, plus 5 pages containing the title page, table of contents, forward, preface and introduction.

3. "Third Eye" by Sonya Stewart, a manuscript consisting of a table of contents, forward, preface, introduction, and a 47–page manuscript.[38]

The court will refer to the first document as the treatment, to the third document as the 47–page manuscript, and to the components of the second set of documents as (i) the synopsis, (ii) the character list, (iii) the character descriptions, (iv) the illustrations, (v) "The Making of The Third Eye,"[39] and (vi) the 29–page manuscript. Although Stewart attached only the first and third documents to her complaint, the complaint references the second document and its components, identifying the document by various names, including: " 'The Third Eye' (add on manuscript),"[40] "a 45 page instrument,"[41] the "Epic Science Fiction Manuscript,"[42] and "plaintiff's federal copyright protected complete 45 page 'The Third Eye' Epic Science Fiction Manuscript."[43] A careful reading of the complaint reveals that the 45–page document includes the original draft of Stewart's full manuscript, graphic illustrations, character descriptions, and a synopsis.[44] It is un-

clear whether "The Making of The Third Eye" is part of the 45–page instrument or a separate document.[45] For ease of reference, the court refers to the entire collection of documents, including "The Making of The Third Eye," as the "45–page instrument."[46] The 29–page manuscript included in the 45–page instrument differs in only minor respects from the 47–page manuscript.

**E. The Pending Action**

Stewart filed this action on April 24, 2003. On July 14, 2004, she filed a first amended complaint. On September 27, 2004, the court granted defendants' motion to dismiss Stewart's RICO claims with leave to amend. On January 3, 2005, Stewart filed a second amended complaint. Defendants once again moved to dismiss Stewart's RICO causes of action. Concurrently with this order, the court grants that motion. Alternatively, as set forth in this order, it finds that defendants are entitled to judgment on the RICO claims because no triable issues of fact remain regarding the copyright infringement on which certain of the RICO claims are based.

**II. DISCUSSION**

**A. Legal Standard Governing Summary Judgment**

A motion for summary judgment must be granted when "the pleadings, deposi-

---

**38.** *Id.* at 2–3.

**39.** As alleged in the complaint, the title of this document is, "The Makings of The Third Eye." Plaintiff's filings in opposition to the motions for summary judgment, however, use the term, "The Making of The Third Eye."

**40.** Complaint, ¶ 2.

**41.** *Id.,* ¶ 17.

**42.** *ld.*

**43.** *Id.,* ¶ 26.

**44.** *Id.,* ¶¶ 2, 26.

**45.** Compare *id.,* ¶ 2 (identifying "The Making[ ] of The Third Eye" as a separate document) with ¶ 26 (stating that "The Making[ ] of The Third Eye" is part of the 45–page document).

**46.** See Complaint, ¶ 17 (referring to this compilation of literary and artistic works as "a 45 page instrument.")

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir.1996) ("mere allegation

and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

## B. Standard Governing Copyright Infringement Claims

█ "Copyright law protects an author's expression; facts and ideas within a work are not protected." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir.1990); see also *Sid & Marty Krofft Television Productions v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir.1977) ("It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself").

The Copyright Act vests a copyright owner with the exclusive right to reproduce, distribute copies of, and prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106. Violation of any of the rights granted under § 106 constitutes infringement. See *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 398, n. 2, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974) ("Although the Copyright Act does not contain an explicit definition of infringement, it is settled that unauthorized use of copyrighted material inconsistent with the 'exclusive rights' enumerated [therein], constitutes copyright infringement under federal law"), superseded by statute on other grounds as recognized in *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984); *Cormack v. Sunshine Food Stores, Inc.*, No. 84CV2963DT, 1987 WL 46890, * 2 (E.D.Mich. May 1, 1987) ("By its literal terms, the Copyright Act gives a copyright holder the 'exclusive' right to reproduce or authorize reproduction of the copyrighted work. 17 U.S.C. § 106(1). The Act defines an infringer as 'anyone who violates the exclusive rights

of the copyright owner....' 17 U.S.C. § 501(a)"); *SBK Catalogue Partnership v. Orion Pictures Corp.*, 723 F.Supp. 1053, 1063 (D.N.J.1989) ("Under § 501(a), any unauthorized use of copyrighted material which is inconsistent with the exclusive rights enumerated in § 106 (i.e., by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute) constitutes copyright infringement").

■■■ To prevail on a copyright infringement claim, a plaintiff must show (1) ownership of a valid copyright and (2) copying of the original elements of the protected work. See *Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1037 (9th Cir.2000); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1043, n. 2 (9th Cir.1994). Absent direct evidence of copying, the second element of the claim requires a fact-based showing that defendant had "access" to plaintiff's work and that the two works are "substantially similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir.2000) (quoting *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996)), *cert. denied*, 531 U.S. 1126, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001). Where evidence of access is lacking, a "striking similarity" between the works may give rise to a permissible inference of copying. See *Three Boys Music, supra*, 212 F.3d at 485 ("in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the songs were 'strikingly similar' "); *Onofrio v. Reznor*, 208 F.3d 222, 2000 WL 206576, * 1 (9th Cir. Feb.23, 2000) (Unpub.Disp.) ("Without any showing of access, Onofrio can only prevail by establishing that Reznor's songs are 'strikingly similar' to the protected elements in his songs"); *Baxter v. MCA, Inc.*, 812 F.2d 421, 424, n. 2 (9th Cir.) ("Proof of striking similarity is an alternative means of proving 'copying' where proof of access is absent"), cert. denied, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); see also *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1249 (11th Cir.1999) ("If the plaintiff cannot show access, the plaintiff may still prevail by demonstrating that the works are so strikingly similar as to preclude the possibility of independent creation"); *Smith, supra*, 84 F.3d at 1219 (citing *Baxter* and noting that "establishing access eliminates the need for a plaintiff to establish a 'striking similarity' between plaintiff's and defendant's work").

The Terminator Defendants assert that they are entitled to summary judgment because (1) Stewart cannot establish that Hurd or Cameron had access to the Third Eye literary materials; (2) she cannot establish that Fox had any role in creating, writing, developing, financing or producing the Terminator films; (3) the protectable expression in the Third Eye literary materials is not substantially or strikingly similar to the protectable expression in the Terminator films; (4) the screenplay for Terminator 1 was completed before Stewart finished a complete draft of her Third Eye manuscript; (5) Stewart's claims are barred by the statute of limitations and the doctrine of laches; and (6) Stewart's RICO claims fail because they are based on allegations of copyright infringement.

The Matrix Defendants contend that they are entitled to summary judgment because (1) Stewart cannot present evidence raising a triable issue of fact regarding their access to her writings prior to the creation of the Matrix 1, and (2) Stewart cannot present evidence raising a triable issue of fact regarding the substantial or striking similarity of her works and Matrix 1, 2, and 3.

## C. Whether The Terminator And Matrix Defendants Are Entitled To Summary Judgment On Stewart's Copyright Infringement Claims

The Terminator and Matrix Defendants do not dispute Stewart's allegation that she owns a valid copyright. Rather, they contend that no triable issue of fact exists as to whether they copied her protected works. Stewart can prevail at trial only if she produces evidence showing (1) that defendants had "access" to her works and that the Terminator and Matrix films are "substantially similar" to those works; or (2) evidence that the accused films are "strikingly similar" to her works.

### 1. Whether Stewart Has Raised A Triable Issue Of Fact Regarding Access

■ To prove access, Stewart must show that defendants had "an opportunity to view or to copy [her] work." *Three Boys Music, supra,* 212 F.3d at 482; see also *Sid & Marty Krofft, supra,* 562 F.2d at 1172. To do so, she must demonstrate that there is a "reasonable possibility" or "reasonable opportunity" defendants were able to view her works, not simply a "bare possibility" they did so. See *Three Boys Music, supra,* 212 F.3d at 482; *Meta–Film Associates v. MCA,* 586 F.Supp. 1346, 1355 (C.D.Cal.1984).

■ Stewart can prove that there is a "reasonable possibility" defendants had access through circumstantial evidence "in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work ..., or (2) the plaintiff's work has been widely disseminated." *Three Boys Music, supra,* 212 F.3d at 482.

"Where the copyrighted work has only been published to a limited audience, ... access cannot be inferred absent evidence that the defendants had a reasonable opportunity to view the work." *Repp v. Lloyd Webber,* 858 F.Supp. 1292, 1301 (S.D.N.Y.1994), rev'd. on other grounds, 132 F.3d 882 (2d Cir.1997); see also *Jason v. Fonda,* 526 F.Supp. 774, 776–77 (C.D.Cal.1981) (the fact that two to seven hundred copies of plaintiff's book were available in Southern California bookstores "creates no more than a 'bare possibility' that defendants may have had access to plaintiff's book"), aff'd., 698 F.2d 966 (9th Cir.1982).

### a. The Terminator Defendants The Terminator Defendants

The Terminator Defendants concede that Fox had access to Stewart's protected works in the 1980's when Stewart sent a copy of the six-page treatment to Fox's Vice President of Creative Affairs and a copy of her completed manuscript to David Madden. They contend, however, that no triable issue exists regarding the "access" prong of Stewart's copyright infringement claim, since no one at Fox was involved in creating, writing, developing or producing any of the Terminator films. Although Cameron and Hurd were involved in the creative process for Terminator 1 and 2, defendants contend there is no triable issue of fact regarding the fact that they did not have access to Stewart's works. Defendants rely, in part, on Stewart's admissions. Defendants' requests for admission defined "The Third Eye" to "mean and refer to the 6–page treatment and/or the approximately 47–page manuscript both []titled 'The Third Eye.'" [47] Stewart's admissions regarding "The Third Eye" thus

---

47. See Declaration of David H. Boren In Support Of (1) The Matrix Defendants' Notice Of Motion And Motion For Summary Judgment Pursuant To Fed.R.Civ.Proc. 56; (2) The Terminator Defendants' Notice Of Motion And Motion For Summary Judgment Pursuant To Fed.R.Civ.Proc. 56; (3) Defendants' Motion To Dismiss Plaintiff's Second Amended Complaint, With Prejudice Pursuant To Fed.R.Civ. Proc. 41(b); And Defendants' Motion To Preclude Plaintiff's Testimony Pursuant To Fed.

pertain to the treatment and the 47–page manuscript.[48]

Stewart's admissions establish that: (1) no person at Fox was involved in any way in creating, writing, developing or producing Terminator 1, 2, or 3;[49] (2) Stewart "ha[s] no factual basis or evidence to support the allegation that Fox provided Cameron a copy" of the treatment or the 47–page manuscript;[50] (3) Stewart "ha[s] no factual basis or evidence to support the allegation that Fox provided Hurd a copy" of the treatment or the 47–page manuscript;[51] (4) Stewart "ha[s] no factual basis or evidence to support the contention that Fox provided any person connected with" Terminator 1, 2, or 3 a copy of the treatment or the 47–page manuscript;[52] (5) Cameron did not have access to the treatment or the 47–page manuscript;[53] and (6) Hurd did not have access to the treatment or the 47–page manuscript.[54]

▆▆▆ In addition to relying on Stewart's admissions, defendants proffer evidence showing that the individuals who created the Terminator films did not have access to Stewart's protected works. In his declaration, Cameron states that he has never seen, read, received or had access to Stewart's "Third Eye Literary Materials."[55] He asserts that he has never

---

R.Civ.Proc. 37(d). ("Boren Decl."), Exh. S at 204.

**48.** Stewart challenges this conclusion, asserting that her six-page treatment and the 47–page manuscript are both "clearly [ ]titled 'Third Eye' " rather than "The Third Eye." (Pl.'s Terminator Opp. at 4.) The identity of the documents to which the admissions pertain is clear. The admissions describe the two literary works attached to Stewart's complaint. To the extent any confusion is created by the inclusion of the indefinite article "the," it began when Stewart repeatedly alleged in her complaint that the copyrighted works were titled "The Third Eye." (See Complaint, ¶¶ 2, 16–19, 22, 23, 26, 30, 44, 64.)

**49.** Boren Decl., Exh. S at 206–07.

**50.** *Id.* at 207.

**51.** *Id.* at 207.

**52.** *Id.* at 208.

**53.** *Id.* at 229.

**54.** *Id.* at 249.

**55.** Declaration Of James Cameron In Support Of The Terminator Defendants' Motion For Summary Judgment ("Cameron Decl."), ¶¶ 3, 5–8. Stewart objects to paragraph 3 of Cameron's declaration on the relevance hearsay, and best evidence grounds. The paragraph reads:

"As I understand it, Plaintiff Sophia Stewart . . . alleges in her lawsuit that she wrote: (1) a six-page treatment entitled the 'Third Eye,'; (2) a forty-five page manuscript entitled the 'Third Eye;' and (3) an additional document which Stewart calls the 'Making of the Third Eye' (collectively, the 'Third Eye Literary Materials')."

Although Cameron's testimony apparently relies on the allegations of Stewart's complaint, which are hearsay under the Federal Rules of Evidence when offered for the truth of the matter asserted (see *Century "21" Shows v. Owens*, 400 F.2d 603, 609–10 (8th Cir.1968); *T.I Construction Co., Inc. v. Kiewit Eastern Co.*, Civ. A. No. 91–2638, 1992 WL 382306, * 4 (E.D.Pa. Dec.10, 1992)), Stewart cannot raise such an objection here for two reasons. First, "any pleading may be used against the pleader as an admission of the facts stated therein." *Century "21" Shows, supra,* 400 F.2d at 610. Second and more fundamentally, Cameron does not offer the allegations for their truth, i.e., to prove that Stewart is the author of the works. Rather, he offers the allegations to describe his understanding of Stewart's claim. Because they are not offered for the truth, the statements are not inadmissible hearsay. See Fed.R.Evid. 801(c). They are relevant, moreover, because they concern the subject matter of Stewart's lawsuit, and provide a definition of the term, "Third Eye Literary Materials" as it is used in subsequent paragraphs of the declaration detailing Cameron's lack of access to the works. Stewart's best evidence objection also fails. The best evidence rule is inapplicable because Cameron's testimony is not offered to prove the contents of a writing. See Fed.R.Evid. 1002. See *United States v. Mayans,* 17 F.3d

met with or spoken to Stewart, and that he had not heard of Stewart prior to the time she filed suit against him.[56] Cameron states that the screenplay for Terminator 1 was completed in October 1982, prior to the date Stewart allegedly completed the full manuscript of Third Eye.[57] He also asserts that he had no business, working or other relationship with Fox during the period he created, wrote, developed, sought financing for, and directed the film, or at any time prior to October 1984.[58]

Hurd has also submitted a declaration stating that she has never seen, read, received or had access to the "Third Eye Literary Materials."[59] Hurd asserts that

she has never met with or spoken to Stewart, and that she had not heard of Stewart prior to the time Stewart sued her for copyright infringement.[60] She states that she had no business, working or other relationship with Fox during the period she created, wrote, developed, sought financing for, and directed Terminator 1, or at any time prior to October 1984.[61]

Finally, Mark E. Meyerson, Fox's Vice President of Legal Affairs has submitted a declaration stating that Fox "played no role, and had no involvement whatsoever, in creating, writing, developing, financing or producing" any of the Terminator films. Rather, "after 'Terminator 1' was a com-

---

1174, 1184–85 (9th Cir.1994) (holding that the trial court erred in sustaining best evidence objections to questions regarding witnesses' understanding of the terms of written plea agreements). Accordingly, Stewart's objection to paragraph 3 of the Cameron declaration is overruled. For the same reasons, her objections to identical paragraphs in the declarations of Hurd, Laurence Wachowski, and Andy Wachowski are also overruled.

Cameron and Hurd define the "Third Eye Literary Materials" that they reference in their declarations as "(1) a six-page treatment [ ]titled the 'Third Eye,'; (2) a forty-five page manuscript [ ]titled the 'Third Eye;' and (3) an additional document which Stewart calls the 'Making of the Third Eye.'" Cameron and Hurd thus assert that they have never seen, read, received or had access to the six-page treatment, the 45–page instrument, or the single page "Making of The Third Eye." Their terminology is consistent with that used in Stewart's complaint, which denominates a document comprised of an "original" draft, synopsis, illustrations, and character descriptions as "a 45 page instrument" or "45 page manuscript." Although Hurd and Cameron describe the "Making of the Third Eye" as a separate document, while Stewart now asserts that "The Making of The Third Eye" is part of the 45–page instrument, the complaint contains inconsistent allegations regarding inclusion of the document in the 45–page instrument. (Compare Complaint, ¶ 2 with id., ¶ 26.) As previously discussed, the court attaches no significance to the presence or absence of the article "the" in the parties' de-

scription of the works, since both plaintiff and defendants have used the titles "The Third Eye" and "Third Eye" interchangeably to refer to a single document.

**56.** *Id.,* ¶ 4. Stewart contends that Cameron's statement that he has never met with or spoken to her, and that he had not heard of her prior to the time she filed suit is irrelevant. The statement is clearly relevant to the issue of access, however. See *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 487, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) ("Evidence is 'relevant' if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence,' " quoting FED.R.EVID. 401). Accordingly, the court overrules Stewart's objections to this paragraph and to identical paragraphs in the declarations of Hurd, Laurence Wachowski, and Andy Wachowski.

**57.** Complaint, ¶ 2; see also Stewart Terminator Decl., ¶ 4.

**58.** *Id.,* ¶¶ 10, 11, 12, 23.

**59.** Declaration Of Gale Ann Hurd In Support Of The Terminator Defendants' Motion For Summary Judgment ("Hurd Decl."), ¶¶ 3, 5–8.

**60.** *Id.,* ¶ 4.

**61.** *Id.,* ¶¶ 10–12.

pleted picture, and after 'Terminator 2' was a completed picture, Fox ... acquire[d] some limited distribution rights with respect to those two pictures." [62] Meyerson asserts that Fox has had no involvement whatsoever with Terminator 3.[63]

Coupled with Stewart's admissions, these declarations are evidence that the makers of Terminator 1, 2, and 3 did not have access to Stewart's protected literary works,[64] and created the films independently. Stewart, who bears the burden of proof on this issue, must therefore adduce contradictory evidence that raises a triable issue of fact regarding access. The only evidence Stewart proffers regarding access is her own declaration and certain documents attached thereto. In a separate order, the court has precluded Stewart

from offering testimony in opposition to defendants' motions for summary judgment. Thus, none of the evidence she submits may be considered, and no triable issue of fact defeating summary judgment has been raised.

■ Even were the court to consider Stewart's declaration and exhibits, moreover, it would conclude that she had failed to raise a triable issue of fact regarding access. Stewart asserts that she sent her six-page treatment to Fox in May 1981, and her "manuscript" to Fox in November 1983.[65] She contends that Fox employees Susan Meszbach and David Madden, who had access to her literary works, later went to work at Paramount, and that Paramount "owns Terminator." [66] The latter assertion lacks foundation,[67] and cannot be considered in deciding defendants' sum-

---

**62.** Declaration Of Mark E. Meyerson In Support Of The Terminator Defendants' Motion For Summary Judgment ("Meyerson Decl."), ¶ 4. Meyerson details the distribution rights Fox acquired as follows: (1) in the mid–1980's, Fox entered into a license agreement with Orion Pictures, pursuant to which it obtained limited rights to distribute videocassettes of Terminator 1 in certain foreign countries through 1989 (*id.*, ¶ 8); (2) in 1998 and 1999, Fox entered into license agreements with two other companies, pursuant to which it obtained the right to distribute videocassettes and DVDs of Terminator 1 and 2 in certain domestic and foreign territories (*id.*, ¶ 7.)

**63.** *Id.*, ¶ 9.

**64.** Stewart's admissions conclusively establish that neither Cameron, Hurd, nor any other person connected with Terminator 1, 2, or 3 had access to the six-page treatment or 47–page "Third Eye" manuscript. The declarations submitted by Cameron and Hurd establish that they did not have access to Stewart's 45–page manuscript, which included the original draft, synopsis, illustrations and character descriptions.

**65.** See Pl.'s Terminator Opp. at 9–10; Stewart Terminator Decl., ¶ 4. The "manuscript" to which Stewart refers appears to be the 45–page instrument, including the one-page "The Making of the Third Eye," as this is the docu-

ment attached as Exhibit 2 to Stewart's declaration.

**66.** Stewart Decl., ¶ 6.

**67.** The Terminator Defendants object to Stewart's conclusory assertions that Meszbach and Madden went to work for Paramount and that Paramount owns the Terminator films, *inter alia*, on the basis that they are not based on personal knowledge and lack foundation. (See The Terminator Defendants' Objections to, and Motion to Strike Portions of the Declarations of Sophia Stewart Filed in Opposition to Their Motion for Summary Judgment ("Terminator Defendants' Objections"), ¶ 4.) As a person working in the entertainment industry, Stewart has sufficient personal knowledge to testify to the fact that Meszbach and Madden left Fox and went to Paramount. See *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir.2000) ("Griesbach's five-year tenure as Arrow's credit manager lends support to his claim of 'personal knowledge' of industry practice"); *E.E.O.C. v. Catholic Knights Ins. Soc.*, 915 F.Supp. 25, 27 (N.D.Ill.1996) ("Sheedy's testimony is admissible because he held a position in which he would be expected to know the amount of control Catholic Knights exhibited over the insurance agents. That Sheedy was fired and that Sheedy did not occupy the position for almost a year before the relevant time are factors that go to

mary judgment motion. See FED.R.CIV. PROC. 56(e). Stewart, moreover, fails to indicate when Meszbach and Madden went to Paramount, and fails to adduce evidence that Paramount had any role in creation of the Terminator films.[68] She also provides no evidence from which a trier of fact could infer that Paramount provided copies of the "Third Eye" to Cameron and/or Hurd. Thus, even putting aside its inadmissibility, Stewart's assertion that Paramount owns the Terminator films fails to show a chain of access through which Cameron or Hurd could have gained access to her literary works. See *Three Boys Music, supra*, 212 F.3d at 482 ("Access may not be inferred through mere speculation or conjecture"); see also *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312 (6th Cir.2004) (" '[a]ccess may not be inferred through mere speculation or conjecture,' " quoting *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir.1999), and 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[A] ); *Gaste v. Kaiserman*, 863 F.2d 1061, 1066–67 (2d Cir.1988) (although a reasonable inference of access may be

drawn even when plaintiff's theory of access through third parties relies "on a somewhat attenuated chain of events extended over a long period of time and distance," it is not sufficient to show "a bare possibility ... inferred through speculation or conjecture"); *Tisi v. Patrick*, 97 F.Supp.2d 539, 547 (S.D.N.Y.2000) ("[P]laintiffs must show 'significant, affirmative and probative evidence' of a chain of access to survive a summary judgment motion by the defendants"). Accordingly, even had the court not precluded Stewart from testifying, her declaration would be insufficient to raise a triable issue of fact concerning transmission of her works to Cameron or Hurd via Paramount employees.

■■■ Stewart's declaration similarly fails to raise a triable issue of fact regarding Fox's role in creating, writing and developing the Terminator films.[69] First, Stewart is barred from presenting evidence that directly contradicts her admission that Fox had no role in creating, writing, developing or producing Terminator 1, 2, or 3.[70] See FED.R.CIV.PROC. 36(b)

the weight of the evidence, not its sufficiency"). She does not, however, demonstrate that she personally knows the identity of the owner of the Terminator films, and offers only a conclusory assertion in this regard. See *Travelers Casualty and Surety Co. of America v. Telstar Construction Co., Inc.*, 252 F.Supp.2d 917, 924 (D.Ariz.2003) ("Plaintiff provides no facts establishing Mausolf possessed the legal requisite of personal knowledge of the information contained in Exhibit 1. Instead, Plaintiff argues the Court should assume personal knowledge based on a conclusory statement by Mausolf. Such conclusory affidavits fail to establish foundation"); *Farris v. McNicols*, No. 00CV7387, 2001 WL 1740250, * 4, n. 5 (N.D.Ohio Dec.5, 2001) ("The affidavit is of dubious admissibility here. The affiant's conclusory reference to 'personal knowledge' fails to show the basis for his 'knowledge'—i.e., that he is a competent witness"). Defendants' objection to this

portion of the paragraph is therefore sustained.

The Terminator Defendants, moreover, have adduced admissible evidence that Paramount *does not* "own" the Terminator films. (See Declaration Of Gale Anne Hurd In Support Of The Terminator Defendants' Reply To Plaintiff Sophia Stewart's Opposition To Their Motion For Summary Judgment ("Hurd Reply Decl."), ¶ 5 ("Paramount does not own 'The Terminator' or any of its sequels. I receive participation statements in connection with 'The Terminator' and those participation statements are not sent by Paramount").)

68. According to evidence submitted by defendants, the original Terminator film was co-produced by Hemdale Film Corporation and Orion Pictures. See Hurd Decl., ¶ 22.

69. Pl.'s Terminator Opp. at 10.

70. Boren Decl., Exh. S at 206–07.

("Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission"); *American Auto. Ass'n. v. AAA Legal Clinic*, 930 F.2d 1117, 1120 (5th Cir.1991) ("An admission that is not withdrawn or amended cannot be rebutted by contrary testimony or ignored by the district court simply because it finds the evidence presented by the party against whom the admission operates more credible"). Moreover, even if the admission were not binding, and Stewart's declaration were considered, she proffers no evidence indicating that Fox participated in writing, creating or producing the Terminator films. Stewart submits (1) a March 8, 2002 Wall Street Journal article, which suggests that, following the release of Terminator 2, Fox and Cameron worked collaboratively but unsuccessfully to acquire the rights to make Terminator 3; and (2) a purported print-out of a web page allegedly showing that Twentieth Century Fox Home Entertainment distributed Terminator 1 in Germany.[71] Stewart asserts that the Wall Street Journal article proves that Bill Mechanic, Fox's former chairman, invested money in Terminator 1 and 2.[72] Generally, newspaper articles are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted. See *United States ex rel. Woods v. Empire Blue Cross and Blue Shield*, No. 99 Civ. 4968(DC), 2002 WL 1905899, * 1, n. 1 (S.D.N.Y. Aug.19, 2002); *In re Columbia Securities Litigation*, 155 F.R.D. 466, 474 (S.D.N.Y.1994) (holding that press reports were hearsay because they were out-of-court statements offered to prove the truth of the matter asserted). Even when the actual statements quoted in a newspaper article constitute nonhearsay, or fall within a hearsay exception, their repetition in the newspaper creates a hearsay problem. See *Larez v. Los Angeles*, 946 F.2d 630, 642 (9th Cir.1991) ("As the reporters never testified nor were subjected to cross-examination, their transcriptions of Gates's statements involve a serious hearsay problem"). Thus, statements in newspapers often constitute double hearsay. See *United States Football League v. Nat'l Football League*, 1986 WL 5803, * 2 (S.D.N.Y. May 16, 1986) (holding that statements of belief by unknown declarants reiterated in a newspaper article constituted hearsay within hearsay). This is the case with respect to the article Stewart proffers. Moreover, the only reference to Mechanic in the article is a quotation from him indicating that Fox chose *not* to become involved in Terminator 3 after Cameron decided not to work on the project.[73] Nothing in the article suggests that Mechanic or Fox had any role in or invested money in Terminator 1 or 2. It affirmatively demonstrates that Fox had no involvement in Terminator 3. Accordingly, this piece of evidence raises no triable issues of fact regarding access or involvement by Fox in the creation or production of the Terminator films.

Stewart next contends that the purported web page documents Twentieth Century Fox Home Entertainment's distribution of Terminator 1 in Germany, and contradicts a claim made by Fox's counsel that the studio's involvement with the film was limited to the distribution of home videos in foreign territories.[74] What Fox's attorney may have represented in a letter is not relevant in determining whether Stewart has raised a triable issue of fact

---

**71.** See *id.;* Stewart Terminator Decl., Exhs. 5, 7.

**72.** Pl.'s Terminator Opp. at 10.

**73.** See Stewart Terminator Decl., Exh. 5 (John Lippman, *The Producers: "The Terminator" Is Back,* Wall Street Journal, March 8, 2002.)

**74.** *Id.,* Exh. 8.

defeating Fox's motion for summary judgment. The pertinent inquiry is whether Stewart has adduced evidence that contradicts Fox's showing in support of the motion. The purported web page does not. First, the document is not properly authenticated, and cannot be considered in deciding the Terminator Defendants' motion.[75] See Fed.R.Civ.Proc. 56(e); see also *Orr v. Bank of America N.T. & S.A.*, 285 F.3d 764, 773 (9th Cir.2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.... Authentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' ... We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment").

■ Second, even if it were considered, the document does not raise a triable issue of fact regarding Fox's involvement in the creation, writing, development and produc-

tion of Terminator 1, 2, and 3. As noted earlier, Fox has proffered evidence that it acquired limited distribution rights to Terminator 1 and 2 domestically and in various foreign markets.[76] To the extent Exhibit 7 is what Stewart contends it is, it is entirely consistent with, and does not contradict, Fox's evidence regarding the distribution rights it acquired in the film after it was created and produced.[77] Although distribution of an infringing work is itself a form of infringement (see, e.g., 17 U.S.C. § 106(3)); *Ortiz–Gonzalez v. Fonovisa*, 277 F.3d 59, 62 (1st Cir.2002) ("Section 106(3) [of the Copyright Act] explicitly grants to the copyright owner the exclusive right to distribute copies of the copyrighted work.... The Copyright Act further provides that 'anyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright.' ... Thus, if Distribuidora distributed copies of Ortiz–Gonzalez's copyrighted work, the act of distribution is a direct infringement itself, not an act of contributory or

75. Neither the web address nor the origin of the web page is indicated. Rather, the text of the purported web page is the body of an email sent to Stewart by someone whose email address is "brownfhf@aol.com." Defendants object to paragraph 7 of Stewart's declaration (which incorporates Exhibit 7), *inter alia*, on the basis that it lacks foundation and states facts that are not within Stewart's personal knowledge. Stewart does not state how she knows that the information reflected on Exhibit 7 comes from a web page, nor whether the web page is purportedly maintained by Fox or some other entity. In fact, because a third party sent the email to Stewart, it appears that her knowledge regarding the text of the email is purely derivative. Because she provides no information indicating that she has personal knowledge of the fact that the text of Exhibit 7 can be found on a web page, Stewart cannot authenticate the document, and it cannot be considered in deciding the Terminator Defendants' motion for summary judgment. See Fed.R.Civ.Proc. 56(e); Fed. R.Evid. 901. Certain unexplained aspects of the document, moreover, underscore its un-

certain origin. Stewart does not indicate how the parenthetical references to "votes" that follow several of the titles (including Terminator 1) relate to video distribution in Germany. Additionally, the court notes that the entry for Terminator 1 appears in a different typeface than the remainder of the titles, suggesting that it may have been added. For all of these reasons, the court sustains the Terminator Defendants' objection and declines to consider Exhibit 7 and the references to it found in paragraph 7 of Stewart's declaration.

76. Meyerson Decl., ¶¶ 6–8.

77. Twentieth Century Fox Home Entertainment distributes videocassettes for home use. See Hoover's In–Depth Company Records, May 4, 2005, available on Westlaw at 2005 WLNR 6973447 ("Twentieth Century Fox Home Entertainment is the home video and DVD production and distribution unit of Fox Filmed Entertainment's Twentieth Century Fox").

vicarious infringement"); *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 843 (11th Cir. 1990) ("Public distribution of a copyrighted work is a right reserved to the copyright owner, and usurpation of that right constitutes infringement"),[78] Stewart has failed to raise a triable issue regarding the fact that Cameron and Hurd had access to her copyrighted works at the time they created the Terminator films. Accordingly, she has failed to raise a triable issue of fact regarding Fox's liability for copyright infringement as a distributor of two of the films.

 Stewart's final contention regarding access concerns statements purportedly made to her in 2001 by FBI employees regarding their investigation of her criminal copyright claim. Stewart asserts that the FBI developed evidence that "established [her] as the writer of the movie 'The Matrix' and 'The Terminator'" because "the FBI explained to [her] in 2001 that ... the Terminator series and the Matrix trilogies were from the same source work," and that "[a]ll of the key characters in the Matrix movie ha[d] been identified from [Stewart's] work."[79] Because they are offered for the truth of the matter asserted, the statements the FBI purportedly made to Stewart are hearsay, and inadmissible for the purpose of ruling on defendants' motions for summary judgment. See FED. R.EVID. 801(c); FED.R.CIV.PROC. 56(e).[80] Other than these hearsay statements in

Stewart's declaration, the only evidence proffered regarding the FBI investigation is an unauthenticated one-page FBI form that contains no reference to Stewart's claim and that has a single handwritten comment—"Looks like a 295 E case."[81] Although she relies on this statement in opposing summary judgment on the issue of the Terminator Defendants' access, Stewart has adduced no evidence as to what a "295 E case" is.[82] Thus, even if she were able to offer testimony in opposition to defendants' motions for summary judgment, Stewart's statements regarding the FBI's investigation are inadmissible hearsay, and the FBI document she proffers is unauthenticated and thus inadmissible. The document, moreover, contains no information that relates obviously to access or to any other element of Stewart's copyright infringement claim.

In sum, the Terminator Defendants have adduced uncontroverted evidence that the creators of the Terminator films did not have access to Stewart's literary works. Stewart has adduced no admissible evidence controverting this showing, or supporting an inference that Hurd, Cameron or any other person or entity involved in creating the Terminator films had access to her works. Even if Stewart's testimony were admissible, no reasonable juror could conclude, based on the evidence adduced, that the creators of the Terminator films had access to the Third Eye literary works. See *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir.1984) ("[T]he jury

---

**78.** Copyright infringement can be negligent as well as intentional. See, e.g., *Ford Motor Co. v. Summit Motor Products*, 930 F.2d 277, 299 (3d Cir.1991) (defendant's intentions are irrelevant because copyright infringement is strict liability tort); *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F.Supp.2d 780, 787 (D.Md.2000) ("De Andre's conduct in relation to the allegedly infringing activity can at most be characterized as negligent.... [T]he distinction between negligent and intentional infringement is irrelevant for purposes of liability"); *Edu-*

*cational Testing Serv. v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D.Cal.1999) (copyright infringement is a strict liability tort).

**79.** Stewart Terminator Decl., ¶ 8.

**80.** Defendants' objections to paragraph 8 on this basis are sustained.

**81.** Stewart Terminator Decl., Exh. 11.

**82.** See Pl.'s Terminator Opp. at 11.

cannot draw an inference of access based upon speculation and conjecture alone"). Accordingly, the court finds that, absent evidence raising a triable issue of fact regarding the striking similarity of Stewart's protected works and Terminator 1, 2, and 3, the Terminator Defendants will be entitled to summary judgment on Stewart's copyright claims.

### b. The Matrix Defendants

Stewart bases her claim that the Matrix Defendants had access to her works on the assertion that she mailed her treatment and manuscript to the Wachowskis in the summer of 1986 in response to an advertisement they allegedly placed in a national magazine.[83] Citing Stewart's admissions, the Matrix Defendants contend that no triable issue of fact remains respecting the "access" prong of Stewart's claim. The admissions establish that: (1) no one at Warner Bros. had access to the six-page treatment or 47–page manuscript prior to the creation of Matrix 1;[84] (2) Larry and Andy Wachowski did not place an advertisement soliciting works of science fiction in a national magazine;[85] (3) Stewart never submitted the treatment or the 47–page manuscript to Larry Wachowski, Andy Wachowski, Silver or Bloom;[86] (4) Larry Wachowski, Andy Wachowski, Silver and Bloom did not have access to the six-page treatment or the 47–page manuscript prior to the creation of Matrix 1, 2 or 3;[87] and (5) Larry and Andy Wachowski independently created Matrix 1, 2, and 3.[88] Stewart also admitted that no one connected with Matrix 1, 2, or 3 had access to the treatment or the 47–page manuscript.[89]

In addition to relying on Stewart's admissions, the Matrix Defendants proffer evidence that the individuals who created the Matrix films did not have access to Stewart's protected works. Andy Wachowski has submitted a declaration stating that he never saw, read, received or had access to Stewart's "Third Eye Literary Materials,"[90] that he has never met with or spoken to Stewart, and that he had not heard of Stewart prior to the time she filed this action.[91] Andy Wachowski also states that he did not place an advertisement in a national magazine soliciting works of science fiction in 1986 or at any other time.[92] In fact, he asserts, he was 18 years old in 1986 and had just graduated from high school.[93]

Laurence ("Larry") Wachowski similarly asserts that he has not seen, read, received or had access to Stewart's "Third Eye Literary Materials,"[94] that he has never

---

83. See Complaint, ¶ 26; Plaintiff's Opposition To The Matrix Defendants' Motion For Summary Judgment ("Pl.'s Matrix Opp.") at 8.

84. *Id.* at 265.

85. *Id.* at 285, 306. Stewart, in fact, admitted that "there was *no* 'advertisement' " as that term was defined in the requests for admission, i.e., the advertisement Stewart alleged that the Wachowskis caused to be placed in a national magazine in the summer of 1986 soliciting works of science fiction.

86. *Id.* at 286, 307, 328, 345.

87. *Id.* at 286–87, 307–08, 329, 326.

88. *Id.* at 288, 309.

89. *Id.* at 287–88.

90. Declaration of Andy Wachowski in Support of the Matrix Defendants' Motion for Summary Judgment ("A. Wachowski Decl."), ¶¶ 3, 5–8.

91. *Id.,* ¶ 4.

92. *Id.,* ¶¶ 11–12.

93. *Id.,* ¶ 3.

94. Declaration Of Laurence Wachowski In Support Of The Matrix Defendants' Motion For Summary Judgment ("L. Wachowski Decl."), ¶¶ 3, 5–8.

met with or spoken to Stewart, and that he had not heard of Stewart prior to the commencement of this suit.[95] Like his brother, he states that he did not place an advertisement in a national magazine soliciting works of science fiction in 1986 or at any other time.[96] In 1986, Larry Wachowski was 21 years old and attending Bard College in New York.[97]

Teresa Wayne, Warner Bros.' Vice President of Story and Creative Administration, has also submitted a declaration. Wayne has worked for Warner Bros. for 24 years, and has been in charge of the Story Department since 1993.[98] She states that Warner Bros. accepts scripts, treatments or other literary material only from licensed literary agents, or from producers, attorneys or managers with whom it has a business relationship.[99] When a creative executive receives literary material, he or she submits it to the Story Department. The Story Department maintains a computerized database into which it enters every script, treatment or other literary material it receives. The database is checked and updated daily.[100] Wayne checked the database to determine the date Stewart's work, "Third Eye," was received by Warner Bros. The database reflects that Stewart's literary work was first received on April 16, 1999, when she sent it to Warner Bros.' legal department with a claim letter.[101]

The database shows that Joel Silver first submitted The Matrix to Warner Bros. on February 4, 1994.[102] The film was released domestically on March 31, 1999, prior to the date Warner Bros. received Stewart's literary materials.[103]

These declarations, together with Stewart's admissions, show that the creators of Matrix 1, 2, and 3 did not have access to any of Stewart's protected works and created the films independently. Stewart bears the burden of proof on this issue, of course, and must therefore adduce contradictory evidence that raises a triable issue of fact regarding access to defeat summary judgment. The only evidence Stewart proffers regarding access is her own declaration and certain documents attached thereto. In a separate order, the court has precluded Stewart from offering testimony in opposition to defendants' motions for summary judgment. Thus, none of the evidence she submits may be considered, and no triable issue of fact defeating summary judgment has been raised.

Even if Stewart's declaration and exhibits were to be considered, moreover, the court would conclude that she had failed to raise a triable issue of fact regarding access. Stewart asserts that she mailed the six-page treatment, the 45–page instrument and the 47–page manuscript to the Wachowskis in 1986 in response to an advertisement in a national magazine.[104]

95. *Id.*, ¶ 4. The Wachowskis define the "Third Eye Literary Materials" that they reference in their declarations as "(1) a six-page treatment []titled the 'Third Eye,'; (2) a forty-five page manuscript []titled the 'Third Eye;' and (3) an additional document which Stewart calls the 'Making of the Third Eye.'" As discussed in note 55, *supra,* the Wachowskis, like Cameron and Hurd, thus assert that they have never seen, read, received or had access to the six-page treatment, the 45–page instrument, or the single page "Making of The Third Eye."

96. *Id.*, ¶¶ 11–12.

97. *Id.*, ¶ 3.

98. Declaration Of Teresa Wayne In Support Of The Matrix Defendants' Motion For Summary Judgment ("Wayne Decl."), ¶ 1.

99. *Id.*, ¶ 3.

100. *Id.*, ¶ 4.

101. *Id.*, ¶ 9.

102. *Id.*, ¶ 7.

103. *Id.*, ¶ 8.

104. Pl.'s Matrix Opp. at 8; Declaration of Sophia Stewart In Support Of Plaintiff's Op-

This testimony is inadmissible, however, because Stewart cannot proffer evidence that directly contradicts her admission that the magazine advertisement never existed. See FED.R.CIV.PROC. 36(b); *American Auto. Ass'n., supra,* 930 F.2d at 1120.[105]

Plaintiff next argues that Warner Bros.' unauthorized access to her work can be inferred from a letter that Jeremy N. Williams, Deputy Chief Counsel for Warner Bros., sent to Her in 1999. This letter responded to an infringement claim that Stewart had asserted. It analyzed the purported similarities between Stewart's work and Matrix 1, and concluded that Stewart's claim lacked merit.[106] Stewart asserts that the only document she sent Warner Bros. was the 47–page manuscript titled "Third Eye." [107] Williams letter rejecting Stewart's claim, however, refers to the work as "The Third Eye." [108] Stewart contends that Williams' addition of "the" to the title of her work reveals that he was not analyzing the work she forwarded to Warner Bros., but rather the 45–page instrument she mailed to the Wachowskis in 1986.[109] Stewart contends she has raised a triable issue of fact concerning access be-

position To The Matrix Defendants' Summary Judgment Motion ("Stewart Matrix Decl."), ¶ 6.

**105.** The Matrix Defendants contend that plaintiff's statement that she "responded to an advertisement requesting science fiction manuscripts to make into a comic book," and "sent to Larry Wachowski and Andy Wachowski [her] protected literary work," (Sewart's Matrix Decl., ¶ 6.) is also inadmissible based on the best evidence rule. "The best evidence rule provides that the original of a 'writing, recording, or photograph' is required to prove the contents thereof." *United States v. Bennett,* 363 F.3d 947, 953 (9th Cir.2004) (citing FED.R.EVID. 1002). However, plaintiff's statement is not directed at proving the contents of a writing. Although plaintiff offers a general description of a writing—the purported advertisement—she offers it for the purpose of showing how she came to mail her literary works to the Wachowskis. See *Jackson v. Crews,* 873 F.2d 1105, 1110 (8th Cir.1989) (finding no violation of the best evidence rule where plaintiff asked his witnesses to describe the contents of a flyer for the purpose of "show[ing] how the witness learned of the case and came to testify").

Defendants also contend that Stewart's statement that she mailed the six-page treatment, the 45–page instrument and the 47–page manuscript is an attempt to prove the contents of the mailing. "The best evidence rule provides that the original of a 'writing, recording, or photograph' is required to prove the contents thereof." *United States v. Bennett,* 363 F.3d 947, 953 (9th Cir.2004) (citing FED.R.EVID. 1002). Here, the issue is whether Stewart mailed certain documents to the Wachowskis in or about 1986, not the contents of those documents or any cover letter that accompanied them. See *id.* ("The rule's application turns on 'whether contents are sought to be proved,'" quoting FED.R.EVID. 1002, Advisory Committee Note). It is true that Stewart has not produced a copy of her 1986 mailing, or any proof that the mailing took place, and that this appears inconsistent with the fact that she has such documentation for other submissions of literary material during the same time period. See Declaration Of Bruce Isaacs In Support Of The Matrix Defendants' Motion For Summary Judgment ("Isaacs Decl."), ¶ 8, Exh. 12 at 148–49 (revealing that Stewart retained proofs of mailing for submissions of literary materials to Fox in 1984 and 1985, and that she also retained a proof of mailing and a receipt dated January 29, 1987 for a payment made to the Writer's Guild of America). This goes to the weight of the evidence, however, not to its admissibility. On summary judgment, of course, the court does not weigh evidence, but merely determines whether triable issues of fact remain that must be decided at trial.

**106.** Pl.'s Matrix Opp. at 10–11.

**107.** *Id.* at 11; Stewart Matrix Decl., ¶ 8.

**108.** *Id.;* see Declaration of John Schulman in Support of the Matrix Defendants' Motion for Summary Judgment ("Schulman Decl."), Exh. 8.

**109.** Pl.'s Matrix Opp. at 11; Stewart Matrix Decl., ¶ 9. Although the Matrix Defendants object to paragraph 9 of Stewart's declaration on the grounds that it lacks foundation and is speculative and conclusory, Stewart has per-

cause "[t]he only way that Mr. Williams could have analyzed '*The* Third Eye' was if he already had the manuscript." [110]

Because it rests on the premise that she sent her literary materials to the Wachowskis in response to a national magazine advertisement they placed in 1986, this argument impermissibly contradicts Stewart's admission that the Wachowskis did not place an advertisement soliciting works of science fiction in a national magazine.[111] Moreover, no reasonable trier of fact could find that Williams' use of "The Third Eye" rather than "Third Eye" establishes that Warner Bros. had unauthorized access to a prior draft of Stewart's manuscript. Despite the fact that they bear the title "Third Eye," Stewart's own complaint repeatedly refers to the treatment and the 47–page manuscript as "The Third Eye." It appears, therefore, that Williams' error was unremarkable, and does not raise a genuine issue of fact defeating summary judgment. See *Anderson, supra,* 477 U.S. at 249–50, 106 S.Ct. 2505 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted"); *id.* at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—

'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed' "); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[T]he issue of fact must be 'genuine.' ... When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial' "); *City of Vernon v. Southern California Edison Co.,* 955 F.2d 1361, 1369 (9th Cir.1992) (stating that "[i]t is not enough for a party [opposing summary judgment] to content itself once it has produced a mere scintilla of evidence to support its case").

Stewart seeks further support for her contention that Warner Bros. gained unauthorized access to her work in a conversation she purportedly had with Julie Nulack, a Warner Bros. attorney. Stewart contends that Nulack admitted that Warner Bros. knew about the "original manuscript" titled "The Third Eye," and knew that it did not belong to the Wachowskis. She asserts that Nulack told her not to settle her claim because Nulack and others had seen the original manuscript being copied.[112] Stewart's repetition of Nulack's purported statement is hearsay unless it is properly admitted as a party admission.[113]

---

sonal knowledge of the document she submitted to Warner Bros. and of the contents of the letter she received from Williams in 1999. Had the court not precluded Stewart's testimony, therefore, it would overrule these objections.

**110.** *Id.* (emphasis added).

**111.** *Id.* at 285, 306.

**112.** Stewart Matrix Decl., ¶ 11.

**113.** Defendants contend Nulack's purported statement is irrelevant, and inadmissible because it occurred during the course of a settlement negotiation. Nulack's statement is relevant in that it has some tendency in rea-

See Fed.R.Evid. 801(d) (2)(D) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship"). To demonstrate that the statement is admissible under Rule 801(d)(2) (D), Stewart must establish, by substantial evidence, (1) that an agency relationship between Fox and Nulack existed; (2) that Nulack's statements were made during the course of that relationship; and (3) that the statements concerned matters within the scope of Nulack's agency. See, e.g., *Hilao v. Estate of Marcos,* 103 F.3d 767, 775 (9th Cir.1996) ("The existence of an agency relationship is a question for the judge under Rule 104(a) and must be proved by substantial evidence but not by a preponderance of the evidence"); see also *Gomez v. Rivera Rodriguez,* 344 F.3d 103, 116 (1st Cir. 2003); *Pappas v. Middle Earth Condominium Ass'n.,* 963 F.2d 534, 537 (2d Cir. 1992). Here, accepting Stewart's statement that Nulack was a Warner Bros. attorney, she has proffered no evidence that Nulack had authority to make statements concerning Stewart's claim. She has not detailed Nulack's position within Warner Bros.' legal department. Nor has she explained the nature of Nulack's participation, if any, in evaluating the claim or determining Warner Bros.' position with respect to it. Accordingly, the court cannot find that Nulack's alleged statement concerned a matter within the scope of her agency for Warner Bros. See *Breneman v. Kennecott Corp.,* 799 F.2d 470, 473 (9th Cir.1986) ("Rule 801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment"); see also *United States v. Chang,* 207 F.3d 1169, 1176 (9th Cir.) (the party proffering evidence pursuant to Rule 801(d)(2)(D) bears the burden of establishing an adequate foundation), cert. denied, 531 U.S. 860, 121 S.Ct. 148, 148 L.Ed.2d 98 (2000); *Harris v. Itzhaki,* 183 F.3d 1043, 1054 (9th Cir.1999) (citing *Breneman* ). As a consequence, the Matrix Defendants' hearsay objection to it must be sustained.

Finally, Stewart contends that she has raised a triable issue of fact regarding the Matrix Defendants' access because FBI agents purportedly told her in 2001 that their investigation of her criminal copyright claim had "established [her] as the writer of the movie 'The Matrix' and 'The Terminator.' " [114] As she does in her opposition to the Terminator Defendants' motion for summary judgment, Stewart again attempts to rely on an unauthenticated one-page FBI form, which does not indicate that it concerns Stewart's claim, and which contains a single handwritten comment: "Looks Like a 295 E case." [115] Stewart also asserts that FBI Special Agent John Barros told her Matrix 1 was

---

son to make Stewart's theory of access more probable. See Fed.R.Evid. 401. Given Stewart's assertion that Nulack's statements were made "after [she] made her claim to Warner Bros." and "[d]uring a settlement meeting," however, it appears that Nulack's remarks may be inadmissible under Rule 408. See Fed.R.Evid. 408 ("Evidence of conduct or statements made in compromise negotiations is likewise not admissible"); see also *Affiliated Manufacturers, Inc. v. Aluminum Co. of America,* 56 F.3d 521, 526–28 (3d Cir.1995) (stating that "Rule 408 has been interpreted

as applicable to an actual dispute, or at least an apparent difference of view between the parties concerning the validity or amount of a claim," and that "the meaning of 'dispute' as employed in the rule includes both litigation and less formal stages of a dispute"). Since the court excludes the testimony on other grounds, however, it need not finally decide this issue.

**114.** Stewart Matrix Decl., ¶ 11.

**115.** Stewart Matrix Decl., Exh. 11.

edited to remove an introduction allegedly copied from her work.[116] Stewart's hearsay statements concerning remarks purportedly made by FBI agents are not admissible. FED.R.CIV.PROC. 56(e). The FBI document is likewise inadmissible, as it is unauthenticated. See *id.; Orr, supra,* 285 F.3d at 773 ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment"). Even if it were considered, moreover, the document contains no information regarding the Matrix Defendants' access to Stewart's literary works or to any other element of her copyright infringement claim.

In sum, the Matrix Defendants have adduced uncontroverted evidence that the creators of the Matrix movies did not have access to Stewart's protected literary works. Stewart has adduced no admissible evidence controverting this showing, or supporting an inference that the Wachowskis, Silver, Warner Bros., or any other person or entity involved in creating the Matrix films had access to her works. Accordingly, the court finds that, absent evidence raising a triable issue of fact regarding the striking similarity of Stewart's protected works and Matrix 1, 2, and 3, the Matrix Defendants will be entitled to summary judgment on Stewart's copyright claims.[117]

### 2. Proving Access Through "Striking Similarity"

Although the Ninth Circuit has not squarely addressed the question, a majority of courts that recognize the "striking similarity" doctrine hold that it is a means of proving access, not that it obviates the need to prove access.[118] See, e.g., *Bouchat*

---

**116.** Stewart Matrix Decl., ¶ 11.

**117.** In her opposition, Stewart seeks a continuance pursuant to Rule 56(f) for the purpose of deposing Williams, Nulack and defendants. (See Pl.'s Matrix Opp. at 22; Declaration Of Michael T. Stoller In Support Of Plaintiff's Opposition To Defendants' Motion For Summary Judgment ("Stoller Decl."), ¶ 3.) "To prevail under ... Rule [56(f)], parties opposing a motion for summary judgment must make (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists. The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment. The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past, or if the movant fails to show how the information sought would preclude summary judgment." *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1129–30 (9th Cir.2004) (internal quotation marks and citations omitted). Because the court has found on multiple occasions that Stewart has not prosecuted this action and pursued discovery diligently, her Rule 56(f) motion must be denied. (See Order Denying Plaintiff's *Ex Parte* Application for Continuance of Case Management Dates at 5; see also Order Denying Plaintiff's Motion for Relief Pursuant to Rule 60(b).) Moreover, Stewart has failed to show that the information sought would preclude summary judgment. The court has found that a reasonable trier of fact could not find, based on Williams' use of the title, "The Third Eye," that he had unauthorized access to a early draft of Stewart's manuscript. Because Stewart's testimony has been excluded, moreover, she has presented no admissible evidence concerning Nulack's involvement in the case. Similarly, because Stewart's admissions conclusively establish lack of access, Stewart could not proffer contradictory information obtained from Williams, Nulack or the Wachowskis. Given Stewart's lack of diligence in pursuing discovery and her failure to show how the information sought would preclude summary judgment, the court denies her request for a Rule 56(f) continuance.

**118.** The Ninth Circuit's decisions can be read as contradictory on this point. Some cases employ broad language that could be interpreted to mean that it is proper to find access solely on the basis of striking similarity. See, e.g., *Seals–McClellan v. Dreamworks, Inc.,* 120 Fed.Appx. 3, 4 (9th Cir.2004) (Unpub.Disp.)

*v. Baltimore Ravens, Inc.*, 241 F.3d 350, 356 (4th Cir.2001) ("Unlike the Fifth Circuit, this court does not favor the wholesale abandonment of the access requirement in the face of a striking similarity. Rather, like the Second and Seventh Circuits, this court recognizes that striking similarity is one way to demonstrate access. Access remains an indispensable part of a copyright infringement claim"); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1170 (7th Cir.1997) ("a similarity that is so close as to be highly unlikely to have been an accident of independent creation is evidence of access"); *Gaste, supra*, 863 F.2d at 1067–68 (holding that striking similarity between works permits an inference of access because it establishes a high probability of copying and negates any reasonable possibility of independent creation) but see *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 113 (5th Cir.1978) (where there is a striking similarity between works that precludes the possibility of independent creation, " 'copying' may be proved without a showing of access").

■ Courts adopting the majority rule generally require that an inference of

copying drawn from striking similarity between works "be reasonable in light of all the evidence. A plaintiff has not proved striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not preclude any reasonable possibility of independent creation." *Gaste, supra*, 863 F.2d at 1068; see also *Bouchat, supra*, 241 F.3d at 356 ("Any finding of access must be reasonable in light of all of the facts of a particular case"). In *Selle, supra*, 741 F.2d at 901, the Seventh Circuit described the requirement as follows:

> " . . . no matter how great the similarity between the two works, it is not their similarity *per se* which establishes access; rather, their similarity tends to prove access in light of the nature of the works, the particular . . . genre involved and other circumstantial evidence of access. In other words, striking similarity is just one piece of circumstantial evidence tending to show access and must not be considered in isolation; it must be considered together with other types of circumstantial evidence relating to access. As a threshold matter, therefore, it would appear that there must be at

("Where a plaintiff cannot show a reasonable opportunity for access, proof that the protected and accused works are 'strikingly similar' gives rise to an inference of copying"); *Winn v. Opryland Music Group, Inc.*, 22 Fed.Appx. 728, 729 (9th Cir.2001) (Unpub.Disp.) ("The court did not even need to consider the access question because of the 'striking similarity' between the song claimed by Appellants and that claimed by Appellees"); *Nintendo of America, Inc. v. Brown*, 94 F.3d 652, 1996 WL 468590, * 1 (9th Cir. Aug.12, 1996) (Unpub.Disp.) ("[B]ecause there is a 'striking similarity' between the games Brown sold and Nintendo's games, an inference of copyright infringement arises"); *Baxter, supra*, 812 F.2d at 423 ("Absent evidence of access, a 'striking similarity' between the works may give rise to a permissible inference of copying," citing *Selle, supra*, 741 F.2d 896). At other times, the Ninth Circuit has appeared to indicate

that striking similarity alone is not sufficient to establish access. See *Fodor v. Time Warner, Inc.*, 19 F.3d 27, 1994 WL 65287, * 2 (9th Cir. Mar.2, 1994) (Unpub.Disp.) ("However, if Warner did not have access to the screenplay prior to the writing of *Target Stealth*, even striking similarities between the two works must be deemed fortuitous," citing *Feist Publications, supra*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358); see also *Berkla v. Corel Corp.*, 66 F.Supp.2d 1129, 1144 (E.D.Cal. 1999) ("[T]he Ninth Circuit permits access to be shown by circumstantial evidence. A striking similarity between the infringed and infringing work may be sufficient to demonstrate access"). Many of the cases that contain broad language regarding striking similarity, moreover, rely on *Baxter*. In *Baxter*, the parties stipulated that defendant had had access to plaintiff's work. *Baxter, supra*, 812 F.2d at 424.

least some other evidence which would establish a reasonable possibility that the complaining work was available to the alleged infringer. As noted, two works may be identical in every detail, but, if the alleged infringer created the accused work independently or both works were copied from a common source in the public domain, then there is no infringement. Therefore, if the plaintiff admits to having kept his or her creation under lock and key, it would seem logically impossible to infer access through striking similarity. Thus, although it has frequently been written that striking similarity alone can establish access, the decided cases suggest that this circumstance would be most unusual. The plaintiff must always present sufficient evidence to support a reasonable possibility of access because the jury cannot draw an inference of access based upon speculation and conjecture alone.... Thus, although proof of striking similarity may permit an inference of access, the plaintiff must still meet some minimum threshold of proof which demonstrates that the inference of access is reasonable."

*Selle* has been criticized for requiring proof of a "reasonable possibility" of access rather than a "bare possibility" of access. 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B] (2002) (criticizing the *Selle* requirement that there be a "reasonable possibility" of access—not just a "bare possibility"—even in cases of truly striking similarity); see also *Gaste, supra,* 863 F.2d at 1068 ("In this Circuit, the test for proof of access in cases of striking similarity is less rigorous"); cf. *Ty, supra,* 132 F.3d at 1170 ("But unlike ... the authors of ... Nimmer on Copyright ..., we do not read our

decision in *Selle* to hold or imply, in conflict with the *Gaste* decision, that no matter how closely the works resemble each other, the plaintiff must produce some (other) evidence of access").

Given the Ninth Circuit's statement of the striking similarity test in *Baxter,* and its citation to *Selle,* the court concludes that the Ninth Circuit follows the majority rule that striking similarity will support an inference of access only when such an inference is reasonable in light of the totality of the evidence in the record. It further concludes that the Ninth Circuit would not require evidence of a "reasonable possibility" of access in cases of striking similarity, but would hold, like the Second Circuit, that evidence of a work's availability, together with evidence of striking similarity, supports a finding that defendant impermissibly copied plaintiff's works.[119] Cf. *Three Boys Music, supra,* 212 F.3d at 485 ("Under our case law, substantial similarity is inextricably linked to the issue of access. In what is known as the 'inverse ratio rule,' we 'require a lower standard of proof of substantial similarity when a high degree of access is shown.' Furthermore, in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the songs were 'strikingly similar' "); *Sid & Marty Krofft, supra,* 562 F.2d at 1172 ("... where clear and convincing evidence of access is presented, the quantum of proof required to show substantial similarity may ... be lower than when access is shown merely by a preponderance of the evidence").

The key question is whether the record reflects the bare possibility of access, and whether, given that possibility, the only conclusion that can be drawn from the striking similarity of the works is that one

---

**119.** This test is different from that which relies on a combination of access and substantial similarity. In this context, a "reasonable possibility" of access is required; a "bare possibility" will not suffice. See *Three Boys Music, supra,* 212 F.3d at 482.

derived from the other. See 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B] (2005) ("At base, 'striking similarity' simply means that, in human experience, it is virtually impossible that the two works could have been independently created"); [120] see also Aaron M. Broaddus, *Eliminating the Confusion: a Restatement of the Test for Copyright Infringement,* 5 DEPAUL-LCA J. ART & ENT. LAW 43 (1995) ("It is important to note here that a finding that the defendant's work is strikingly similar to plaintiff's does not eliminate the requirement of access as a condition to proving infringement. Instead, striking similarity gives rise to an inference of access by negating the possibility that the work could have been derived from independent creation, common source or some other work besides the plaintiff's. This distinction is important to keep in mind because, although a showing of striking similarity allows the court to infer access, most courts will still require that there be at least a bare possibility that defendant had access to plaintiff's work").

### a. Whether Plaintiff Can Show A "Bare Possibility" That The Terminator Defendants Had Access To Her Works

Applying the standard articulated above, Stewart cannot sustain her burden of proof unless she can show at least a "bare possibility" of access. As discussed earlier, Stewart has proffered no admissible evidence from which a reasonable trier of fact could find that her works were available to any person involved in the creation, writing development, or production of the Terminator films. Defendants have presented uncontroverted evidence that the individuals involved in creating the Terminator films did not have any access to Stewart's literary works, and that the Terminator films were the product of independent creation. As a result, even evidence of striking similarity between the Terminator films and Stewart's works will not raise a triable issue of fact as to whether the Terminator Defendants had access to the works. This is because "the evidence as a whole does not preclude any reasonable possibility of independent creation." See *Gaste, supra,* 863 F.2d at 1068 ("Though striking similarity alone can raise an inference of copying, that inference must be reasonable in light of all the evidence. A plaintiff has not proved striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not preclude any reasonable possibility of independent creation"); see also *Bouchat, supra,* 241 F.3d at 356 (adopting the *Gaste* test); *Selle, supra,* 741 F.2d at 901 ("... no matter how great the similarity between the two works, it is not their similarity *per se* which establishes access"); *Zimmerman v. Tennille,* No. 83 CIV. 8606(CSH), 1988 WL 42022, * 3 (S.D.N.Y. Apr.21, 1988) (noting *Selle's* statement that there must be some evidence establishing a possibility that plaintiff's work "was *available*" to defendant, the court held that evidence that the parties' works are strikingly similar "does not preserve a plaintiff's claim when the evidence affirmatively negates access," and that summary judgment was appropriate because "plain-

120. Nimmer notes that proof of a "bare possibility" of access is essential. See 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B], n. 70.2 ("It would seem that a bare possibility of access must always be present in order for plaintiff to go forward. For example, even if defendant's 1000–page novel matches plaintiff's word-for-word, to the extent that the evidence shows that plaintiff had locked her novel in a safe from the instant of composition forward, then that bare possibility is absent. In that event, it might be just as reasonable to imagine that plaintiff copied from defendant, or both derived from a prior work, as to imagine that defendant copied from plaintiff").

tiff at bar [had] failed to offer any plausible proof of access, [and] his theory [of access was] geographically and chronologically implausible"); compare *Onofrio, supra,* 2000 WL 206576 at * 1 (applying the striking similarity test after determining that plaintiff had adduced proof demonstrating a bare possibility of access); *Dan River, Inc. v. Sanders Sale Enterprises, Inc.,* 97 F.Supp.2d 426, 430 (S.D.N.Y.2000) (applying the striking similarity test where there was insufficient evidence in the record to demonstrate access, but undisputed evidence "that [plaintiff's] designs were readily available in retail markets throughout the United States"). Because Stewart has failed to adduce any evidence showing even a bare possibility of access to her works by the Terminator Defendants, it appears they are entitled to summary judgment on Stewart's claims on this basis alone. Given the uncertainty of Ninth Circuit law on this issue, however, the court will examine whether Stewart has raised a triable issue of fact regarding the striking similarity of the parties' works.

**b. Whether Plaintiff Can Show A "Bare Possibility" That The Matrix Defendants Had Access To Her Works**

Stewart has likewise adduced no admissible evidence from which a reasonable trier of fact could conclude that her works were available to any person or entity involved in the creation, writing or production of the Matrix films. Defendants have proffered admissions by Stewart as well as uncontroverted evidence that the individuals involved in creating the Matrix films did not have access to Stewart's literary works. Stewart has admitted, moreover, that the Matrix films were the product of independent creation. Because Stewart has failed to adduce admissible evidence showing even a bare possibility of access to her works by the Matrix Defendants, even evidence of striking similarity between the

Matrix films and Stewart's works will not raise a triable issue of fact as to whether the Matrix Defendants had access to her works, and the Matrix Defendants are entitled to summary judgment on this basis alone. As noted, however, the court will examine whether Stewart has raised a triable issue of fact regarding the striking similarity of the parties' works.

**c. Evidence Of "Striking Similarity"**

In the Ninth Circuit, "summary judgment is not highly favored on questions of ... similarity in copyright cases." *Shaw, supra,* 919 F.2d at 1355. Summary judgment is appropriate only if "no reasonable juror could find [striking] similarity of ideas and expression, viewing the evidence in the light most favorable to the nonmoving party." *Kouf, supra,* 16 F.3d at 1045. "Where reasonable minds could differ on the issue of [striking] similarity, summary judgment is improper." *Smith, supra,* 84 F.3d at 1217. See also *Cavalier v. Random House, Inc.,* 297 F.3d 815, 822 (9th Cir.2002) (" 'Although summary judgment is not highly favored on questions of substantial similarity in copyright cases, summary judgment is appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the non-moving party, that no reasonable juror could find substantial similarity of ideas and expression.... Where reasonable minds could differ on the issue of substantial similarity, however, summary judgment is improper,' " quoting *Shaw* ); *Pasillas v. McDonald's Corp.,* 927 F.2d 440, 442 (9th Cir.1991) ("Our circuit has expressed a certain disfavor for summary judgment on questions of substantial similarity, but it is nevertheless appropriate to grant summary judgment if, considering the evidence and drawing all inferences from it in the light most favorable to the nonmoving party, no reasonable jury could find that the works are substantially similar in idea and expression").

Similarity means a "similarity of expression, not merely similarity of ideas or concepts." *Chase–Riboud v. Dreamworks, Inc.*, 987 F.Supp. 1222, 1225 (C.D.Cal.1997). "Striking similarity" exists when two designs "are so much alike that the only reasonable explanation for such a great degree of similarity is that the later [work] was copied from the first." *Gaste, supra*, 863 F.2d at 1067, n. 3; see also *Blue Fish Clothing, Inc. v. Kat Prints*, CIV. A. No. 91–1511, 1991 WL 71113, * 7 (E.D.Pa. Apr.29, 1991) (" [S]triking similarity simply means that in human experience it is virtually impossible that the two works could have been independently created,' " quoting 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B], n. 20 (1985)); *Kent v. Revere*, No. 84–798–CIV–ORL–18, 1985 WL 6453, * 7 (M.D.Fla. Oct.28, 1985) (same).

Striking similarity is judged not just with reference to the fact that both works contain identical elements, but also by considering the uniqueness and complexity of the common features. See *Selle, supra*, 741 F.2d at 903–04 (" 'Striking similarity' is not merely a function of the number of identical notes that appear in both compositions.... An important factor in analyzing the degree of similarity of two compositions is the uniqueness of the sections which are asserted to be similar. If the complaining work contains an unexpected departure from the normal metric structure or if the complaining work includes what appears to be an error and the accused work repeats the unexpected element or the error, then it is more likely that there is some connection between the pieces.... If the similar sections are particularly intricate, then again it would seem more likely that the compositions are related. Finally, some dissimilarities may be particularly suspicious"). Thus, "to prove that certain similarities are 'striking,' plaintiff must show that they are the sort of similarities that cannot satisfactorily be accounted for by a theory of coincidence, independent creation, prior common source, or any theory other than that of copying. The similarities should be sufficiently unique or complex as to make it unlikely that both pieces were copied from a prior common source, ... or that the defendant was able to compose the accused work as a matter of independent creation." *Id.* at 904.[121]

Here, the court need not—indeed cannot—engage in a side-by-side comparison of the protected and accused works, since neither party has proffered the accused films as part of the record on the pending summary judgment motions. Because Stewart bears the burden of proof on striking similarity, her failure to submit the Terminator and Matrix films in opposition to the motions necessitates the entry of summary judgment against her. See *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir.1986) (affirming summary judgment where plaintiff failed to produce originals of his protected works because "[t]he contents of Seller's work are at issue. There can be no proof of 'substantial similarity' and thus of copyright infringement unless Seller's works are juxtaposed with Lucas' and their contents compared. Since the contents are material and must

---

**121.** The *Selle* court observed that "striking similarity is an extremely technical issue-one with which, understandably, experts are best equipped to deal." *Id.* at 904. Other courts have eschewed the need for expert testimony. Nimmer opines that "while expert testimony may be necessary to establish striking similarity in 'technical' areas, such as music, in many cases, the trier of fact is equipped to make this determination without expert assistance." 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B] (2005) (footnote omitted).

be proved, Seiler must either produce the original or show that it is unavailable through no fault of his own. Rule 1004(1). This he could not do"). As the *Seiler* court noted, proof of substantial or striking similarity depends upon a comparison of the protected works and the accused works. The court must employ a two-part test to determine similarity. The "extrinsic test" is an objective comparison of specific expressive elements such as "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Cavalier, supra,* 297 F.3d at 822; Kouf, *supra,* 16 F.3d at 1045. The "intrinsic test" is a subjective comparison that focuses on whether an "ordinary, reasonable audience" would find the works substantially similar in "total concept and feel." *Cavalier, supra,* 297 F.3d at 822 (quoting *Kouf, supra,* 16 F.3d at 1045). Without defendants' works before it, the court cannot determine if application of either test raises factual issues that must be decided by a jury.

On this basis alone, therefore, the court must enter summary judgment in favor of both the Terminator and the Matrix Defendants. As detailed below, moreover, Stewart's admissions concerning the lack of similarity between her works and the Terminator and Matrix films establish the absence of a triable issue of fact regarding striking similarity.

### i. Whether Plaintiff Can Establish That Her Works Are Strikingly Similar To Terminator 1, 2, And 3

Stewart has admitted that Terminator 1 is neither strikingly nor substantially similar to "The Third Eye"; [122] that Terminator 2 is neither strikingly nor substan-

tially similar to "The Third Eye"; [123] and that Terminator 3 is neither strikingly nor substantially similar to "The Third Eye." [124] Stewart has also admitted that the protectable expression in "The Third Eye" is not substantially similar to the protectable expression in any of Terminator 1, 2, and 3.[125] Although these admissions concern only the six-page treatment and 47–page edited manuscript referenced in and attached to the complaint, the court's review of the 29–page manuscript that forms the core of the 45–page instrument reveals that it is virtually identical to the 47–page manuscript. The only differences are altered margins and insignificant changes in grammar, punctuation, word choice, and page layout that do not change the meaning of the text. Accordingly, Stewart's admission that the 47–page manuscript is not even substantially similar to the accused films precludes any possibility that the virtually identical 29–page draft is strikingly similar to them.

Stewart's admissions concerning substantial and striking similarity do not extend to the synopsis, character list, character descriptions, and illustrations that are included in the 45–page instrument, or to "The Making of The Third Eye". Although her admissions do not encompass these materials, they are not properly before the court on these motions, because only Stewart's testimony, which has been precluded, authenticates them. Even were this not the case, Stewart does not contend that any element uniquely found in the synopsis, character list, character descriptions, illustrations or "The Making of the Third Eye" is substantially or strikingly similar to elements found in the Terminator films.[126] Rather, she identifies and relies

---

122. See Boren Decl., Exh. S at 209.

123. *Id.* at 209–10.

124. *Id.* at 210.

125. *Id.* at 209–10.

126. See Pl.'s Terminator Opp. at 13. The similarities Stewart identifies are a single, common line of dialogue, plot elements com-

on similarities between the Terminator films, on the one hand, and her treatment and manuscript, on the other. Although the synopsis could be said to contain plot lines and settings similar or identical to those found in the treatment and the manuscript, Stewart's admission that the 47–page manuscript is not substantially or strikingly similar necessarily encompasses any similarities found in the synopsis. Her admissions, therefore, conclusively establish that there are no striking similarities between the works.

As defendants have adduced evidence demonstrating the absence of a triable issue of fact on the question of striking similarity, Stewart—who bears the burden of proof at trial—must produce evidence raising an issue of fact in this regard. Notwithstanding her conclusive admissions concerning lack of similarity, Stewart argues that genuine issues of fact remain, citing (1) an internet article that notes plot similarities between the Matrix films and the Terminator films,[127] and (2) her hearsay statement that FBI agents told her the accused films were copied from her work.[128] Because Stewart offers the internet article and the hearsay statements of the FBI agents through her own testimony, and because the court has precluded that testimony, the evidence cannot be considered in assessing whether triable issues of fact defeat summary judgment.

The internet article, moreover, is independently inadmissible. As noted earlier, articles of this type are hearsay under Rule 801(c) when offered for the truth of the matter asserted. See *Larez, supra,* 946 F.2d at 642; *United States ex rel.*

*Woods, supra,* 2002 WL 1905899 at * 1, n. 1; *In re Columbia Securities Litigation, supra,* 155 F.R.D. at 474. Even were it admissible, the fact that the article notes plot similarities between the Matrix films and Terminator films does not support a reasonable inference that both series were copied from Stewart's work. Assuming the article asserted that one series copies the other (which it does not), it would have no tendency to prove the truth of Stewart's allegation that the Terminator films copied her work. The court has also found that the alleged statements of FBI agents recounted by Stewart in her declaration are inadmissible hearsay. Even were this not the case, there is no evidence that the agent or agents with whom Stewart spoke compared her work and the Terminator films and concluded that they were "strikingly similar." None of this evidence, therefore, even if admissible, would raise a triable issue of fact regarding striking similarity.

Stewart criticizes the Terminator Defendants' failure to submit the accused films and their underlying source materials as evidence in support of their summary judgment motion. She contends that they "have failed to offer any evidence regarding access to, and substantial similarity between the original manuscript ... and [their] films." As a consequence, she asserts, they "have failed to sustain their burden on summary judgment."[129] Defendants can prevail on summary judgment, however, merely by pointing out that there is an absence of evidence to support Stewart's case. *Celotex, supra,* 477 U.S. at 323,

---

mon to the manuscript and the Terminator films, setting, and a similarity between Stewart's character, "Iceus," and the Terminator character, "Sarah Connors." Although Stewart asserts one similarity related to character descriptions, "Iceus" is not mentioned in the character descriptions that are included in the 45–page instrument.

**127.** Stewart Matrix Decl., Exh. 6.

**128.** Stewart Terminator Decl., ¶ 8.

**129.** Pl.'s Terminator Opp. at 20.

106 S.Ct. 2548. Stewart has the burden of proof on striking similarity. By failing to proffer the allegedly infringing films for comparison with her works, and by failing to adduce any other admissible evidence of striking similarity, she has failed to satisfy that burden. The Terminator Defendants are thus entitled to have summary judgment entered in their favor on Stewart's copyright infringement claims.[130]

### ii. Whether Plaintiff Can Establish That Her Works Are Strikingly Similar To Matrix 1, 2, and 3

As respects the Matrix films, Stewart has admitted that Matrix 1 is neither strikingly nor substantially similar to her treatment and the 47–page manuscript;[131] that Matrix 2 is neither strikingly nor substantially similar to her treatment and 47–page manuscript;[132] and that Matrix 3 is neither strikingly nor substantially similar to her treatment and 47–page manuscript.[133] She has also admitted that the protectable expression in "The Third Eye" is not substantially similar to the protectable expression in Matrix 1, 2, and 3,[134] and that the Wachowskis independently created Matrix 1, 2, and 3.[135] Although the admissions relate only to the six-page treatment and the 47–page edited manuscript, they preclude a finding that the 29–page draft, which forms the core of the 45–page instrument and which is virtually identical to the 47–page manuscript, is strikingly similar to the accused films.

As with her admissions regarding the Terminator films, Stewart's admissions concerning the similarity of her works to the Matrix films do not extend to the synopsis, character list, character descriptions and illustrations that are included in the 45–page instrument. Nor do they encompass "The Making of the Third Eye." As noted earlier, the 45–page instrument is not properly before the court, since it is not attached to Stewart's complaint, and Stewart proffers only her own testimony,

**130.** In addition to relying on Stewart's admissions, the Terminator Defendants proffer the declaration and expert report of Mark Rose, an English professor at the University of California at Santa Barbara. Rose has previously testified in several matters regarding the substantial or striking similarity of various works. (See Declaration Of Mark Rose In Support Of The Terminator Defendants' Motion For Summary Judgment And The Terminator Defendants' Motion For Summary Judgment ("Rose Decl."), ¶ 1.) Based on his comparison of Stewart's works and the accused works, as well as earlier literary and film works that contain elements found both in Stewart's works and the accused films, Rose opines that Stewart cannot establish that the protectable expression in her works is substantially similar to that in the accused works. (See *id.*, Exh. 2.) Plaintiff objects to the Rose report on the basis that it lacks foundation and violates the best evidence rule. (Pl.'s Terminator Opp. at 12.) Rose has laid an adequate foundation for his opinions, in that he describes his methodology and details the sources on which he relied. Although Rose's description of the accused

films is not admissible to prove their contents (see FED.R.EVID. 1002), an expert may rely on materials not admitted into evidence in forming an opinion (see FED.R.EVID. 703). Stewart's objections that the report is "conjectural," "speculative" and "conclusory" are merely complaints that Rose offers an opinion. An expert may, of course, offer opinion testimony. See FED.R.EVID 703. Rose's report, therefore, is admissible. The court need not rely on Rose's declaration and report to conclude that Stewart has failed to raise a triable issue of fact regarding striking similarity, however, because her admissions are conclusive on the issue, and because she failed to submit a copy of the allegedly infringing films in opposition to defendants' motions.

**131.** See Boren Decl., Exh. S at 266–67.

**132.** *Id.* at 267.

**133.** *Id.*

**134.** *Id.* at 267–68.

**135.** *Id.* at 288, 309.

which has been precluded, to authenticate it. Were the court to consider the documents that comprise the 45–page instrument, however, it would find that Stewart has not raised a triable issue of fact concerning striking similarity.

In her opposition, Stewart does not contend that there are substantial or striking similarities between unique elements of her synopsis or illustrations and the Matrix films.[136] Rather, she contends that there are substantial similarities between her description of the characters "X-sers," "Kev," "Vashta," "Trifina," "Awn," and "Trev"[137] and counterpart characters in the Matrix films, namely, "Tank," "Apoc," "Morpheus," "Trinity," "Cypher," and "Mouse." She further contends that "Zonia," a name she includes in her character list without description, is substantially similar to a character in the Matrix films named "Switch."

Stewart bears the burden of proof on the issue of striking similarity. The only evidence she submits to prove the similarity of her characters to those found in the Matrix films is a single page that contains photographs of nine Matrix 1 characters.[138] This exhibit is inadmissible because it is proffered through Stewart's testimony. Even were the court to consider the exhibit, moreover, it would conclude that it does not raise a triable issue of fact regarding the striking similarity of Stewart's works and the Matrix films. Since the photographs depict only the faces of the Matrix 1 characters, it is impossible for the court to discern whether there are similarities in height, weight, or personality between the two sets of characters. The distinct facial features that Stewart ascribes to certain of her characters are not evident in the exhibit. X-sers' counterpart, Tank, for example, is not bald and there is no earring apparent in the photograph. The photograph is not sufficiently clear to determine if Tank has "piercing" eyes. Kev's counterpart, Apoc, does not appear to have a "hard look," and plainly does not have a Mohawk hairdo. Vashta's counterpart, Morpheus, does not have a beard. Stewart's descriptions of Trifina and Awn do not make reference to facial features, and so cannot be compared to the photographs

---

136. As with the Terminator films, although the synopsis could be said to contain plot lines and settings similar or identical to those found in the treatment and the manuscript, Stewart's admission that the 47–page manuscript is not substantially or strikingly similar necessarily encompasses any similarities found in the synopsis.

137. The relevant character descriptions read, in their entirety:

"X-sers - Ikahn's second in command. 24 years old, 6'2", and weighed 200 lbs. Muscle bounded ... balded with piercing eyes (ear-ring in one ear) ... He was cold logics ... three abilities"

"Kev - 24 years old ... 6'4", weighed 230 lbs ... Strong ... With a hard look. Extremely well-built. Has one ability and no-self discipline ... He was raw and primitive (Mohawk hair-do)"

"Vashta - 45 years old, weighed 168 lbs. 6' feet tall (with a beard). Strong[] charac-

ter and a good advisor. He participated when the times called for."

"Trifina - 5'7" weighed 120 lbs. Pure of heart ... Playing always a symbolic (Major) part in the background, but with awareness of all that takes place ... Like an Angel"

"Awn - 22 years old ... 6'1", weighed 175 lbs. Passive in nature. He went alon[g] with whatever was decided (to a certain extent). He keeps to himself but doesn't miss a thing. No abilities."

"Trev - The last member ... 6" [sic] tall, slender, weighed 165 lbs. Has long shoulder length hair with kiddish features. He was warm hearted and well loved by all. He was the mortal support to Ikahn and the rest ... No abilities ... He was just beginning the path.... 20 years old."

138. See Stewart Matrix Decl., Exh. 10.

of Trinity and Cypher. Although the photograph of Trev's counterpart, Mouse, is of poor quality, and it appears he may have "kiddish" features, it is quite clear that he has short rather than shoulder-length hair. Finally, it is impossible to compare Zonia, who is mentioned only by name, to the photograph of Switch. Because no reasonable finder of fact could find that these photographs, which bear little resemblance to Stewart's character descriptions, establish striking similarity between the Matrix films and Stewart's work, they do not raise a triable issue of fact regarding striking similarity.[139]

Stewart identifies other purported similarities between the Matrix films and her treatment and manuscript. As Stewart's admissions are conclusive evidence that there is no substantial or striking similarity between these works and the Matrix films, however, the claimed similarities cannot be considered by the court. See FED.R.CIV.PROC. 36(b); *American Auto. Ass'n., supra,* 930 F.2d at 1120.

To prove striking similarity, Stewart also relies on (1) an internet article noting plot similarities between the Matrix films and the Terminator films,[140] and (2) a statement by Larry Wachowski quoted in *Time Magazine* to the effect that "[*The Matrix* is] a story about consciousness ... child's perception of an adult world. *The Matrix* is about the birth and evolution of consciousness."[141] Because these materials are introduced through Stewart's testimony, which has been precluded, they cannot be considered. Additionally, the court has found that the internet article is independently inadmissible hearsay. See FED. R.EVID. 801(c); *Larez, supra,* 946 F.2d at 642; *United States ex rel. Woods, supra,* 2002 WL 1905899 at * 1, n. 1; *In re Columbia Securities Litigation, supra,* 155 F.R.D. at 474. In any event, the article does not address Stewart's works, and does not give rise to an inference that both series were copied from those works.

The quotation from Larry Wachowski concerning the "evolution of consciousness" is also inadmissible. Although the quotation itself might be deemed the admission of a party opponent, the repetition of the statement by a magazine reporter is hearsay. See *Larez, supra,* 946 F.2d at 642. Even if it were considered, the statement would not create a triable issue of fact defeating summary judgment. Stewart contends that Wachowski's statement is strikingly similar to a passage in her treatment: "The proposed science fiction film deals with Earth during the year 2110 A.D. By that time planet Earth had experienced horrible nuclear wars, and a Spiritual Evolution was underway. *Man* was finally moving from the unconscious to the conscious stages of spiritual development."[142] The relevant comparison for

---

139. Although Stewart proffers no evidence regarding the stature, weight or personality traits of the Matrix characters, her opposition brief summarizes these characteristics. (Pl.'s Matrix Opp. at 14–15.) Stewart's brief is not evidence. Her description of the Matrix characters, moreover, is supported by no evidence save the conclusory assertion that "[a]ll of [her] characters are identical [to] the characters in [the] Matrix 1 film as far as the physical attributes and abilities." (See Stewart Matrix Decl., ¶ 12.) Even had Stewart's testimony not been precluded, it would not be admissible to prove the contents of the Matrix films, as those films have not been introduced into evidence. See FED.R.EVID. 1002. As a result, Stewart has failed to adduce evidence from which a reasonable trier of fact could find that the Matrix characters are strikingly similar to her character descriptions.

140. Pl.'s Matrix Opp. at 17–18; Stewart Matrix Decl., Exh. 6.

141. Pl.'s Matrix Opp. at 18; Stewart Matrix Decl., Exh. 7.

142. Pl.'s Matrix Opp. at 18; Stewart Matrix Decl., Exh. 1.

copyright infringement purposes, however, is between Stewart's literary works and the Matrix films. The quotation Stewart cites is not from the films, but from a magazine article regarding the films.

Second, the "evolution of consciousness" is an idea rather than the protectable expression of that idea. See *Sid & Marty Krofft, supra,* 562 F.2d at 1163 ("It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself") It is not sufficient that the ideas embodied in two works be similar. Rather, the trier of fact must determine "whether there is substantial similarity in the expressions of the ideas so as to constitute infringement." *Id.* at 1164; see also *Cavalier, supra,* 297 F.3d at 823 ("Copyright law only protects expression of ideas, not the ideas themselves"); *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1398 (9th Cir.1997) (" 'Substantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts").

 As noted earlier, to assess whether works express an idea in similar fashion, courts employ an extrinsic and intrinsic test. The "extrinsic test" contemplates an objective comparison of specific expressive elements in the parties' works,

while the intrinsic test requires a subjective comparison from the point of view of an ordinary, reasonable audience. See *Cavalier, supra,* 297 F.3d at 822 (quoting *Kouf, supra,* 16 F.3d at 1045). Because Stewart has not submitted copies of the Matrix films in opposition to defendants' motion for summary judgment, these comparisons cannot be made.[143] As a result, she cannot raise a triable issue of fact regarding the striking similarity of the manner in which the idea of evolving consciousness is expressed in her works and the Matrix films.

As noted earlier, Stewart has the burden of proof on striking similarity. By failing to proffer the allegedly infringing films for comparison with her works, and by failing to adduce any other admissible evidence of striking similarity, she has failed to satisfy that burden. The Matrix Defendants are thus entitled to have summary judgment entered in their favor on Stewart's copyright infringement claims.[144]

### D. Whether Defendants Are Entitled To Summary Judgment On Plaintiff's RICO Claims

Defendants contend that Stewart's RICO claims "fail as they are based upon, and rise or fall with, the copyright claims."[145] Stewart's RICO claims assert

---

**143.** The extrinsic and intrinsic tests are used to assess not only substantial similarity but striking similarity as well. See, e.g., See *Chiate v. Morris,* 972 F.2d 1337, 1992 WL 197591, * 7, n. 4 (9th Cir. Aug.17, 1992) (Unpub.Disp.) (discussing the extrinsic and intrinsic tests, and noting that if plaintiff cannot prove access, "a 'striking similarity' between the works at issue will give rise to an inference of copying"); *Thimbleberries, Inc. v. C & F Enterprises, Inc.,* 142 F.Supp.2d 1132, 1139 (D.Minn.2001) (using the Eighth Circuit's extrinsic/intrinsic test to assess striking similarity).

**144.** Stewart also proffers declarations filed in *In re the Marriage of Thea Bloom and Lau-*

*rence Wachowski,* Los Angeles Superior Court Case No. BD 380 496 (Stewart Matrix Decl., Exhs. 8, 9), in support of a contention that Larry Wachowski made inconsistent statements during divorce proceedings regarding the dates on which the Matrix films were written. Whether the first Matrix film was written before or after October 26, 1993 has no relevance to the issues in this case, however, as Wachowski admits that the film was written in 1993, after Stewart's purported submission of "Third Eye" to him and his brother in 1986.

**145.** Terminator Defs.' Mot. at 24.

violations of 18 U.S.C. §§ 1962(c) and (d). To prevail on her RICO claims, Stewart must prove that defendants (a) received income derived from a pattern of racketeering activity, and used the income to acquire or invest in an enterprise in interstate commerce; (b) acquired or maintained an interest in, or control of, an enterprise engaged in interstate commerce through a pattern of racketeering activity; (c) caused an enterprise engaged in interstate commerce, by which they were employed, to conduct or participate in a pattern of racketeering activity; or (d) conspired to engage in any of these activities. 18 U.S.C. §§ 1962; see also *United States v. Turkette*, 452 U.S. 576, 582, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ("[i]n order to [prevail] under RICO, [a party] must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' The enterprise is an entity.... The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute"); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir.1997) (plaintiff must allege "(1) the conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity").

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Racketeering activity is any act indictable under the various provisions of 18 U.S.C. § 1961. *Id.* A "pattern" requires the commission of at least two acts of "racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5).

■■■ In addition to proving that defendants conducted an enterprise engaged in a pattern of racketeering activity, Stewart must also prove that their conduct was both the "but for" and proximate cause of a concrete financial injury. *Resolution*

*Trust Corp. v. Keating*, 186 F.3d 1110, 1117 (9th Cir.1999); *Forsyth, supra*, 114 F.3d at 1481 (citing *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1311 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993)). The only financial injury Stewart has alleged is damage flowing from the infringement of her literary works.

■■■ The "predicate acts" the Terminator Defendants allegedly committed are acts of mail and wire fraud on the part of Fox and acts of "criminal copyright infringement" by Cameron and Hurd. The predicate RICO offenses the Matrix Defendants allegedly committed are criminal copyright infringement and alleged mail fraud. The mail fraud allegations are based on the Wachowskis' alleged placement of an advertisement in a national magazine that they knew would elicit responses via interstate mail. As plaintiff has failed to adduce any admissible evidence that any of the individuals who created the Terminator films had access to her literary works, she has failed to show that Fox's use of the wires and mails was either a "but for" or proximate cause of her alleged injury, and the Terminator Defendants are entitled to summary judgment on this aspect of Stewart's RICO claims as a result. Similarly Stewart's mail fraud allegations against the Wachowskis fail because her admission that the purported advertisement does not exist conclusively establishes that there was no use of the mails by those defendants. Finally, because Stewart has failed to adduce sufficient evidence to raise a triable issue of fact regarding defendants' infringement of her copyrighted works, her criminal copyright infringement allegations against all defendants likewise fail. See 18 U.S.C § 2319; 17 U.S.C. § 506(a).

Accordingly, the Terminator Defendants and the Matrix Defendants are entitled to

have summary judgment entered in their favor on Stewart's RICO claims.[146]

### E. The Terminator Defendants' Statute Of Limitations And Laches Defenses

The Terminator Defendants contend that Stewart's claims against Cameron and Hurd are barred by the applicable statute of limitations and that her claims against all Terminator Defendants are barred by the doctrine of laches.

The statute of limitations for claims brought under the Copyright Act is found in 17 U.S.C. § 507(b), which provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).[147] "A cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge." *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir.1994). "[U]nder *Roley*, the statute of limitations does not prohibit recovery of

damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances." *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir.2004). The Terminator Defendants renew their contention, raised previously in a motion to dismiss, that Stewart's purported failure to discover the facts underlying her infringement claims against Cameron and Hurd prior to April 24, 2000 is unreasonable as matter of law.[148] Defendants also renew their argument, raised previously in a motion to dismiss, that Stewart's claims are barred by the doctrine of laches, "an equitable defense that prevents [suit by] a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir.2001) (internal quotations and citations omitted). Because the court has found the Terminator Defendants are entitled to judgment as a matter of law on all of Stewart's claims, it need not address the applicability of the statute of limitations or the doctrine of laches.[149]

---

**146.** Stewart's RICO claims also fail to state a claim for the reasons set forth in the court's contemporaneously filed order on defendants' motion to dismiss the second amended complaint.

**147.** The three year statute of limitations governing copyright infringement actions also governs claims for declaratory relief regarding copyright ownership or infringement. See, e.g., *Meat Loaf Enterprises Inc. v. Sony Music Entertainment, Inc.*, No. 96 Civ. 0991(MGC), 1997 WL 598410, * 5 (S.D.N.Y. Sept.25, 1997) (noting that courts have "not limited the application of the three-year statute of limitations to infringement claims [but have] applied it to claims seeking declarations of copyright ownership").

**148.** Terminator Defs.' Mot. at 19–21; see also Order Denying Defendants' Motion To Dismiss Plaintiff's First Amended Complaint Based On The Statute Of Limitations And Laches.

**149.** In her opposition, Stewart requests that the court reopen discovery pursuant to Rule 56(f) so that she may take discovery related to these defenses. (Pl.'s Terminator Opp. at 18–19.) Because the court has found on multiple occasions that Stewart has not prosecuted this action and pursued discovery diligently, her Rule 56(f) motion must be denied. (See Order Denying Plaintiff's *Ex Parte* Application for Continuance of Case Management Dates at 5; see also Order Denying Plaintiff's Motion for Relief Pursuant to Rule 60(b).) Additionally, since the court's decision of defendants' summary judgment motion does not turn on the affirmative defenses, Stewart cannot show that the information she seeks would preclude summary judgment. Accordingly, Stewart's Rule 56(f) request is denied.

In seeking additional discovery, Stewart contends that she failed to conduct discovery because defendants had not yet filed an answer, and she did not know what allegations would be denied and what affirmative defenses would be asserted. This explanation

## III. CONCLUSION

For the foregoing reasons, the court grants both the Terminator Defendants' and the Matrix Defendants' motions for summary judgment on all claims.

**Proceedings: Order Denying Plaintiff's Motion For Reconsideration**

### I. BACKGROUND

On January 3, 2005, plaintiff Sophia Stewart filed a second amended complaint alleging that defendants Twentieth Century Fox Film Corporation, James Cameron and Gale Anne Hurd (the "Terminator Defendants") had willfully infringed her copyrighted literary works by making and distributing The Terminator ("Terminator 1"), Terminator 2: Judgment Day ("Terminator 2") and Terminator 3: Rise of the Machines ("Terminator 3"). Stewart also alleged that defendants Warner Bros. Entertainment, Inc., Andy Wachowski, Larry Wachowski, Joel Silver, and Thea Bloom (the "Matrix Defendants") had willfully infringed her copyrighted literary works by making and distributing The Matrix ("Matrix 1"), The Matrix Reloaded ("Matrix 2"), and The Matrix Revolutions ("Matrix 3"). Stewart asserted claims for copyright infringement, declaratory relief, and violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961, et seq.

In separately filed motions, the Terminator Defendants and the Matrix Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. At no time during the summary judgment proceedings did Stewart submit copies of the Terminator or Matrix films. On June 15, 2005, the court granted defendants' motions and entered judgment in their favor.

In moving for summary judgment on Stewart's copyright infringement claims,[1]

---

conflicts directly with earlier explanations Stewart has offered for her failure to propound discovery. In plaintiff's initial application to reopen discovery, she attributed her failure to conduct any timely discovery to changes in counsel, the health problems of one of her attorneys, the time that was required to respond to defendants' motion to dismiss and the effort expended in providing partial responses to defendants' discovery. (See Plaintiff's *Ex Parte* Application To Continue The Discovery, Motion Cut–Off Dates, Etc., And/Or Trial at 8.) In her motion for reconsideration of the court's denial of the application, Stewart asserted that her failure to conduct discovery was due to her attorneys' negligence. See (Plaintiff's Motion To Continue Case Management Dates Pursuant To Rule 60(b) at 1–2.) Stewart now offers a new and different explanation for her failure to complete discovery—the absence of a responsive pleading. Given her earlier representations, and the fact that Stewart knew, from argument of the motions to dismiss, that defendants denied her claims of access and copying, and asserted affirmative defenses based on the statute of limitations and laches, it is clear that Stewart's failure to complete timely discovery was not caused by the lack of a responsive pleading.

1. "Copyright law protects an author's expression; facts and ideas within a work are not protected." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir.1990); see also *Sid & Marty Krofft Television Productions v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977) ("It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself").

The Copyright Act vests a copyright owner with the exclusive right to reproduce, distribute copies of, and prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106. Violation of any of the rights granted under § 106 constitutes infringement. See *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 398, n. 2, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974) ("Although the Copyright Act does not contain an explicit definition of infringement, it is settled that unauthorized use of copyrighted material inconsistent with the 'exclusive rights' enumerated [therein], constitutes copyright infringement under federal law"), superseded by statute on other grounds as recognized in *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984); *Cormack v. Sunshine Food Stores, Inc.*, No. 84CV2963DT, 1987 WL 46890, *2 (E.D.Mich.

neither the Terminator nor the Matrix Defendants disputed Stewart's assertion that she owns a valid copyright. They contended, however, that Stewart had not raised a triable issue of fact as to whether they copied the protected works. The court noted that, at trial, Stewart would have to adduce evidence (1) that defendants had access to her works and that the Terminator and Matrix films are "substantially similar" to those works, or (2) that the accused films are "strikingly similar" to

her works.[2] It granted defendants' motion for summary judgment on Stewart's copyright claims in part because Stewart failed to adduce any evidence that would permit a reasonable juror to find that Stewart's works and defendants' films were "strikingly similar."[3] The court noted: "Because Stewart bears the burden of proof on striking similarity, her failure to submit the Terminator and Matrix films in opposition to the motions necessitates the entry of summary judgment against her."[4]

May 1, 1987) ("By its literal terms, the Copyright Act gives a copyright holder the 'exclusive' right to reproduce or authorize reproduction of the copyrighted work. 17 U.S.C. § 106(1). The Act defines an infringer as 'anyone who violates the exclusive rights of the copyright owner....' 17 U.S.C. § 501(a)"); *SBK Catalogue Partnership v. Orion Pictures Corp.*, 723 F.Supp. 1053, 1063 (D.N.J.1989) ("Under § 501(a), any unauthorized use of copyrighted material which is inconsistent with the exclusive rights enumerated in § 106 (i.e., by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute) constitutes copyright infringement").

To prevail on a copyright infringement claim, a plaintiff must show (1) ownership of a valid copyright and (2) copying of the original elements of the protected work. See *Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1037 (9th Cir.2000); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1043 n. 2 (9th Cir.1994). Absent direct evidence of copying, the second element of the claim requires a fact-based showing that defendant had "access" to plaintiff's work and that the two works are "substantially similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir.2000) (quoting *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996)), cert. denied, 531 U.S. 1126, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001). Where evidence of access is lacking, a "striking similarity" between the works may give rise to a permissible inference of copying. See *Three Boys Music*, 212 F.3d at 485 ("in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the songs were 'strikingly simi-

lar' "); *Onofrio v. Reznor*, 208 F.3d 222, 2000 WL 206576, *1 (9th Cir. Feb.23, 2000) (Unpub.Disp.) ("Without any showing of access, Onofrio can only prevail by establishing that Reznor's songs are 'strikingly similar' to the protected elements in his songs"); *Baxter v. MCA, Inc.*, 812 F.2d 421, 424 n. 2 (9th Cir.) ("Proof of striking similarity is an alternative means of proving 'copying' where proof of access is absent"), cert. denied, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); see also *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1249 (11th Cir.1999) ("If the plaintiff cannot show access, the plaintiff may still prevail by demonstrating that the works are so strikingly similar as to preclude the possibility of independent creation"); *Smith*, 84 F.3d at 1219 (citing *Baxter* and noting that "establishing access eliminates the need for a plaintiff to establish a 'striking similarity' between plaintiff's and defendant's work").

2. Order Granting The Terminator Defendants' Motion For Summary Judgment And The Matrix Defendants' Motion For Summary Judgment ("Order") at 12.

3. Order at 39–50.

4. Order at 41 (citing *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir.1986) (affirming summary judgment where plaintiff failed to produce originals of his protected works because "[t]he contents of Seller's work are at issue. There can be no proof of 'substantial similarity' and thus of copyright infringement unless Seller's works are juxtaposed with Lucas' and their contents comparted. Since the contents are material and must be proved, Seiler must either produce the original or show that it is unavailable through no fault of his own")).

On June 28, 2005, Stewart filed a motion for reconsideration under Local Rule 7–18, and alternatively sought relief under Rule 60(b) of the Federal Rules of Civil Procedure. Stewart contends the court should reconsider its order because (1) it failed to consider material facts in deciding the motions; (2) defendants failed to sustain their burden of establishing that a genuine issue of material fact does not exist; and (3) Stewart's counsel failed to submit defendants' films as a result of mistake or excusable neglect.

## II. DISCUSSION

### A. Plaintiffs Motion For Reconsideration Under The Federal Rules

Although styled a motion for relief from judgment under Rule 60(b), Stewart's motion is properly treated as a motion to alter or amend the judgment under Rule 59(e) because it was filed within 10 days of the date judgment was entered in defendants' favor.[5] See *Yellowstone Farming Partnership v. U.S. Dept. of Agriculture,* No. 91–35371, 1991 WL 278922, *2 n. 1 (9th Cir. Dec.30, 1991) (Unpub.Disp.) ("Although YFP and the district court refer to YFP's motion to set aside judgment as one under Fed.R.Civ.P. 60(b), we treat it as a Rule 59(e) motion because it was filed within ten days of entry of judgment"); *Swimmer v. I.R.S.,* 811 F.2d 1343, 1344 (9th Cir.1987) ("That latter motion, though it mentioned Rule 60, was made within ten days and could have been brought under Rule 59. We may treat such a motion as having been made under Rule 59"); *Sea Ranch Ass'n v. California Coastal Zone Conservation Commissions,* 537 F.2d 1058, 1061 (9th Cir.1976) ("By motion appellants requested relief which might have been granted under FED. R. CIV. P. 59(e). Since it was filed within the 10–day period set by the rule, it should be treated as a Rule 59 motion"); *Rankin v. Heckler,* 761 F.2d 936, 942 (3d Cir.1985) ("Regardless how it is styled, a motion filed within ten days of entry of judgment questioning the correctness of a judgment may be treated as a motion to alter or amend the judgment under Rule 59(e)"); see also *School Dist. No. 1J, Multnomah County v. ACandS, Inc.,* 5 F.3d 1255, 1262 (9th Cir.1993) ("A district court may reconsider its grant of summary judgment under either Federal Rule of Civil Procedure 59(e) (motion to alter or amend a judgment) or Rule 60(b) (relief from judgment)").

**1. Plaintiff's Motion To Alter Or Amend The Judgment Under Rule 59(e)**

**a. Legal Standard Governing Motions To Alter Or Amend A Judgment Under Rule 59(e)**

Rule 59(e) permits a district court to correct an error in its ruling following the entry of judgment. See FED.R.CIV. PROC. 59(e); *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills,* 141 F.3d 1284, 1286 (8th Cir.1998); *Russell v. Delco Remy Div. of General Motors Corp.,* 51 F.3d 746, 749 (7th Cir. 1995) ("Rule 59(e) permits a district court to entertain a motion to alter or amend a judgment"). Thus, reconsideration under Rule 59(e) "is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust,

---

**5.** Under Rule 6(a), time periods prescribed by the Federal Rules of Civil Procedure are measured from the day after the event occurs. "When the period of time prescribed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded from the computation." FED.R.CIV.PROC. 6(a).

The court entered judgment in favor of defendants on June 15, 2005, and Stewart filed her motion for reconsideration on June 28, 2005. Excluding an intervening weekend, Stewart's motion was filed within 10 days of the date the court entered judgment against her.

or (3) if there is an intervening change in controlling law." *ACandS,* 5 F.3d at 1263; see also *Russell,* 51 F.3d at 749 ("A claimant can invoke the rule to direct a court's attention to matters such as newly discovered evidence or a manifest error of law or fact").

"Although Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.' " *Kona Enterprises, Inc. v. Estate of Bishop,* 229 F.3d 877, 890 (9th Cir.2000) (citing 12 James W. Moore et al., MOORE'S FEDERAL PRACTICE, § 59.30[4]); see also *389 Orange Street Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir.1999) ("Under Rule 59(e), a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law" (citation omitted)).

 A district judge has broad discretion in determining whether to grant a Rule 59(e) motion. *Innovative Home Health Care,* 141 F.3d at 1286 (" 'A district court has broad discretion in determining whether to grant a [Fed.R.Civ.P. 59(e)] motion to alter or amend judgment, and this court will not reverse absent a clear abuse of discretion,' " quoting *Global Network Techs., Inc. v. Regional Airport Auth.,* 122 F.3d 661, 665 (8th Cir.1997)); *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.,* 6 F.3d 350, 353 (5th Cir.1993) ("We review the denial of [a Rule 59(e) or 60(b)] motion under an abuse of discretion standard. Under this standard, the court's decision need only be reasonable"). In determining whether to grant a Rule 59(e) motion, the court should consider both the interest in finality of judgments as well as the need to reach just decisions based on all the facts. See *Edward H.*

*Bohlin Co.,* 6 F.3d at 355; see also *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. New York State Dep't of Envtl. Conservation,* 831 F.Supp. 57, 60 (N.D.N.Y.1993) ("When considering a motion such as this, the Court is mindful that there is a strong interest in the finality of judgments. However, where the motion is timely and properly supported, the Court must carefully consider whether any manifest errors were made in the first instance"), aff'd. in part and rev'd. in part on other grounds, 17 F.3d 521 (2d Cir.1994); *Pennsylvania Ins. Guaranty Ass'n. v. Trabosh,* 812 F.Supp. 522, 524 (E.D.Pa. 1992) (a motion for reconsideration "should be granted sparingly because of the interests in finality and conservation of scarce judicial resources").

### b. Whether The Court Should Alter Or Amend Its Judgment

Stewart presents no newly discovered evidence that warrants modification of the judgment. Nor does she cite an intervening change in the controlling law. Rather, she contends that the court committed an error of law that warrants reconsideration and amendment of its order under Rule 59(e). Specifically, Stewart contends that the court incorrectly found that she bore the burden of proving that defendants' films were "strikingly similar" to her copyrighted works.

"Summary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.' " *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); see also *Nebraska v. Wyoming,* 507 U.S. 584, 590,

113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) ("When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case,' " quoting *Celotex*, 477 U.S. at 322).

In a copyright infringement action, plaintiff bears the burden of proving that her work is either substantially or strikingly similar to defendants' work. See *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 571 (9th Cir.1987) ("The plaintiff bears the burden of proving substantial similarity"); *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir.1984) ("To prove infringement, a plaintiff must show that the works are substantially similar"). Because plaintiff bears the burden of proving substantial or striking similarity, "summary judgment for defendant is appropriate when plaintiff fails to make a sufficient showing that the ideas and expressive elements of the works are substantially similar after defendant has properly identified in a motion for summary judgment that plaintiff has failed to do so." *Frybarger v. International Business Machines Corp.*, 812 F.2d 525, 528 (9th Cir.1987); see *Celotex*, 477 U.S. at 322 (the moving party need only inform the court of the basis of its motion and is then " 'entitled to judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof"); *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir.1985) (" '[I]f there is no genuine issue of material fact, and if the resisting party does not present a record sufficient to support a reasonable finding in his favor, a district court has a duty to grant the motion for summary judgment,' " quoting *Filco v. Amana Re-*

*frigeration, Inc.*, 709 F.2d 1257, 1260 (9th Cir.1983)).

Evaluating whether works are strikingly similar requires a comparison of their elements. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir.2002) ("We employ a two-part analysis in this circuit— an extrinsic test and an intrinsic test—to determine whether two works are substantially similar. The 'extrinsic test' is an objective comparison of specific expressive elements. '[T]he test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works.' ... The 'intrinsic test' is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works' "). Stewart failed to submit copies of the allegedly infringing works to show that they were strikingly similar to her copyrighted literary works. Because she failed to submit copies of defendants' films, she failed to meet her burden of raising a triable issue of fact regarding an essential element of her copyright infringement claim. See *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir.1986) (affirming summary judgment where plaintiff failed to produce originals of his protected works because "[t]he contents of Seller's work are at issue. There can be no proof of 'substantial similarity' and thus of copyright infringement unless Seller's works are juxtaposed with Lucas' and their contents compared. Since the contents are material and must be proved, Seiler must either produce the original or show that it is unavailable through no fault of his own.... This he could not do"). *Seeburg Corp. v. AMR Publishing, a Division of Victory Glass Co.*, 80 F.Supp.2d 723, 726 & n. 18 (W.D.Mich.1999) (noting that "[t]he Defendants contend that the Plaintiff cannot

demonstrate infringement because it failed to proffer either the allegedly copyrighted material (original works) or a description of how and when the Defendants allegedly infringed upon the work," but granting summary judgment on the basis that plaintiff had not shown the existence of a valid copyright in the works); *FASA Corp. v. Playmates Toys, Inc.,* 869 F.Supp. 1334, 1348–49 & nn. 22, 24 (N.D.Ill.1994) (noting that after a copyright infringement defendant meets its initial burden of " 'of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact,' " that the burden of production shifts to plaintiff to set forth specific facts showing that there are genuine issues for trial, and observing that "FASA has not even bothered to submit for the court's review four of the five copyrighted works identified in its complaint. The court knows of no other copyright infringement case in which the plaintiff did not submit the subject copyrighted works for the court's review").[6]

In sum, the court did not clearly err in finding Stewart had the burden of raising a triable issue of fact regarding striking similarity. Nor did it err in concluding that she failed to carry that burden by failing to submit defendants' films as part of the summary judgment record.[7] As a result, the court denies Stewart's motion to alter or amend the judgment.

6. *Twentieth Century–Fox Film Corp. v. MCA, Inc.,* 715 F.2d 1327 (9th Cir.1982), cited by plaintiff, is not to the contrary. Although Stewart contends that the MCA defendants submitted copies of plaintiffs' film and book, a video of their first television episode, and a video montage of earlier science fiction works (Pl.'s Mot. at 4–5), the Ninth Circuit's opinion does not indicate which party submitted the items. It states only that "the trial court reviewed" the materials in deciding defendants' summary judgment motion. *Id.* at 1328. Moreover, even had defendants in *Twentieth Century–Fox* submitted the materials as part of their moving papers, this does not mean that they were required to do so. Rather, under *Celotex,* a defendant need do no more than point out the absence of evidence supporting an essential element of plaintiff's case. Once the defendant does this, the burden shifts to plaintiff to offer some evidence creating a genuine issue of material fact as to that element. See *Celotex,* 477 U.S. at 325; see also *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000) (holding that the *Celotex* "showing" can be made by "pointing out through argument ... the absence of evidence to support plaintiff's claim"); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1107 (9th Cir.2000) (holding that once the moving party carries its initial burden of production, "the nonmoving parties were obligated to produce evidence in response").

7. Even were this not the case, plaintiff failed to adduce evidence raising triable issues of fact regarding any defendant's access to her copyrighted works. This necessitated that she adduce evidence raising triable issues as to whether there was a "bare possibility" that the Terminator defendants and the Matrix Defendants had access to her literary materials. See, e.g., *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1170 (7th Cir.1997); *Gaste v. Kaiserman,* 863 F.2d 1061, 1067–68 (2d Cir. 1988). Plaintiff failed to do so. Even had she raised triable issues of fact regarding striking similarity, therefore, her failure to raise genuine issues regarding the bare possibility of access would have necessitated granting defendants' motion. More fundamentally, plaintiff admitted that none of defendants' films was substantially or strikingly similar to her copyrighted literary works. She also failed to adduce evidence rebutting the expert witness reports of Mark Rose proffered by defendants. Rose opined that neither the Terminator films nor the Matrix films were substantially similar to Stewart's Third Eye literary materials. The fact that plaintiff's admissions conclusively established that there was no substantial or striking similarity between the works, and the fact that Rose's opinion was uncontroverted also necessitated the entry of summary judgment in defendants' favor.

### B. Plaintiffs Motion For Relief Under Rule 60(b)(1)

#### 1. Legal Standard Governing Motions For Relief Under Rule 60(b)(1)

Although, as noted, Stewart's request for reconsideration is properly characterized as a Rule 59(e) motion, the result would not change were the court to consider it as a request for relief under Rule 60(b). Rule 60(b)(1) authorizes a court to relieve a party from an order or judgment, *inter alia*, where the judgment is a result of the party's mistake, inadvertence, surprise, or excusable neglect. See FED. R.CIV.PROC. 60(b)(1).[8] The proper application of Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments. See *House v. Secretary of Health and Human Services*, 688 F.2d 7, 9 (2d Cir.1982).

In *Pioneer Investment Services Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 394, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Supreme Court articulated an equitable test to be used in evaluating whether a failure to comply with a filing deadline constituted "excusable neglect" under Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure. The *Pioneer* Court held that determining whether neglect is excusable depends on at least four factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith. *Id.* at 395. The Ninth Circuit has applied the *Pioneer* test in Rule 60(b)(1) cases. See *Briones v. Riviera Hotel & Casino*,

116 F.3d 379, 381 (9th Cir.1997); see also *Bateman v. U.S. Postal Service*, 231 F.3d 1220 (9th Cir.2000). It has stated, however, that the *Pioneer* factors are not exclusive, and that they merely "provide a framework with which to determine whether missing a filing deadline constitutes Excusable' neglect." *Briones*, 116 F.3d at 381. The court will therefore utilize the *Pioneer* factors as a guide in considering whether Stewart's failure to submit defendants' films in opposition to defendants' summary judgment motion qualifies as excusable neglect.

#### 2. Whether Plaintiff Is Entitled To Relief Under Rule 60(b) (1)

##### a. Danger Of Prejudice To The Opposing Party

To establish prejudice under the first prong of *Pioneer*, there must be more harm than simply a delay in resolving the case. See *TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691, 701 (9th Cir.2001) ("[t]o be prejudicial, the setting aside of a judgment must result in greater harm than simply delaying the resolution of the case"). Prejudice is "tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion." See *Thompson v. American Home Assur. Co.*, 95 F.3d 429, 433–34 (9th Cir.1992) (citing *INVST Fin. Group, Inc. v. Chem–Nuclear Sys., Inc.*, 815 F.2d 391, 398 (6th Cir.1987)).

█ Stewart filed this action in April 2003. It has thus been pending for a significant period of time during which defendants have actively defended against

---

8. Rule 60(b) also authorizes relief from a judgment or final order where a party proffers newly discovered evidence; where the judgment is a product of fraud, misrepresentation, or other misconduct; where the judgment is void; or where it has been satisfied or discharged or for any other reason justifying relief. FED.R.CIV.PROC. 60(b). None of these bases is relevant here. Stewart has proffered no new evidence, and does not allege fraud or misconduct. Similarly, there is no suggestion that the judgment is void or that it has been satisfied or discharged.

Stewart's accusations. Defendants' motions for summary judgment were before the court for a significant period of time as well. Defendants filed the motions on April 29, 2005, and the court did not enter judgment until June 15, 2005. During the intervening period, the court and defendants were required to address motions by plaintiff for reconsideration of an earlier order denying her *ex parte* application to continue the discovery cut-off date, and for permission to withdraw the admissions that resulted from her failure to respond to defendants' January 12, 2005 requests for admissions until May 9, 2005. Additionally, defendants filed, and the court addressed, a motion to preclude Stewart from offering testimony in opposition to the pending motions for summary judgment because she failed to appear for deposition on multiple occasions. Plaintiff also failed to file timely opposition to the summary judgment motions, and the court granted a short continuance of the deadline for receipt of such opposition. The resources required to litigate these various matters were substantial. Defendants contend that if Stewart's motion for reconsideration were granted, they would be prejudiced because they would be forced to expend additional time and resources litigating their entitlement to summary judgment in this case.[9]

Given the extensive time and resources defendants have devoted to this case and to their motions for summary judgment, granting Stewart's motion for reconsideration will deprive defendants of more than just a "quick victory." Compare *Bateman*, 231 F.3d at 1220 (holding, in a case where the court granted summary judgment because defendant failed to oppose the motion, that plaintiff would suffer "minimal" prejudice if the judgment were vacated, because "[i]t would have lost [only] a quick victory and, should it ultimately have lost the summary judgment motion on the merits, would have had to reschedule the trial date. But such prejudice is insufficient to justify denial of relief under Rule 60(b)(1)"). Defendants will be forced to devote further resources to litigating this action, responding to evidence that Stewart failed to submit in support of her original opposition to defendants' summary judgment motions. See *In re Chalasani*, 92 F.3d 1300, 1307 (2d Cir.1996) ("The expense incurred in obtaining a default judgment may support a finding that reopening would prejudice a creditor"); *Metropolitan Federal Bank of Iowa, F. S.B. v. W.R. Grace & Co.*, 999 F.2d 1257, 1263 (8th Cir.1993) (prejudice can take the form of "wasted litigation expense"); *Hawkins v. Landmark Finance Co.*, 727 F.2d 324, 327 (4th Cir.1984) ("While the record does not disclose the exact amount, undoubtedly Landmark incurred court costs and counsel fees in reliance on the fact that the debtors did not challenge the validity or viability of its lien. In this we find prejudice and a sufficient basis on which the bankruptcy court could properly conclude, in the exercise of its discretion, that the case should not be reopened"); cf. *United States v. Berg*, 190 F.R.D. 539, 543 (E.D.Cal.1999) (when deciding whether to grant a voluntary dismissal, "[f]actors to consider in determining legal prejudice are: the defendant's effort and expense involved in preparing for trial ..."). These additional costs would be particularly prejudicial because plaintiff's failure to abide by court orders and her failure to follow the basic procedures outlined in the Federal Rules of Civil Procedure have already increased defendants' defense costs exponentially. Defendants would also be

---

9. Defendants' Motion of Points and Authorities in Opposition to Plaintiff's Motion for Reconsideration under Local Rule 7–18 or for Relief under Fed.R.Civ.P. 60(b) ("Def.'s Mot.") at 17.

prejudiced because the court granted their motions for summary judgment on alternative grounds, none of which would be affected by its consideration of the Terminator and Matrix films plaintiff has now lodged. Further proceedings of the type plaintiff requests, therefore, would be futile. Consequently, the first *Pioneer* factor weighs in favor of denying Stewart's motion.

### b. Length Of The Delay And Its Potential Impact On The Proceedings

The second relevant factor under *Pioneer* is the length of a party's delay in seeking reconsideration and its potential impact on the proceedings. In *Bateman,* plaintiff s attorney requested that the court vacate the judgment entered against his client twelve days after defendant's summary judgment motion was granted. *Bateman,* 231 F.3d at 1223. The court denied this request, and plaintiff "filed his Rule 60(b)(1) motion a little more than one month" thereafter. *Id.* The court concluded that the length of the delay and the potential impact on the proceedings was "minimal." *Id.* at 1225. It also noted that, while plaintiff's delay in filing a Rule 60(b)(1) motion was "slightly longer than the two-week delay in *Augusta Fiberglass,* 843 F.2d at 812, [it] was still not long enough to justify denying relief." *Id.;* see also *TCI Group Life Ins. Plan,* 244 F.3d at 701 (holding that the filing of a motion to set aside a default judgment less than a month after it was entered was a "short delay").

Stewart filed this motion within ten days of the court's entry of judgment. Any delay was *de minimis* as a result. See *Bateman,* 231 F.3d at 1225 ("there is no evidence that [due to the delay] the trial would have been postponed for an inordinate amount of time"). This factor therefore weighs in favor of granting Stewart's motion.

### 3. Reason For The Delay

 The third *Pioneer* factor is the movant's reason for the delay. In determining the adequacy of the reason proffered, the court must take into account whether the movant was in reasonable control of the circumstances that caused the delay. See *Marx v. Loral Corp.,* 87 F.3d 1049, 1054 (9th Cir.1996) (citing *Pioneer,* 507 U.S. at 395); see also *In re Schafler,* 263 B.R. 296 (N.D.Cal.2001) (holding that debtor's reason for delay-i.e., that counsel did not receive a copy of the judgment— was weak because "counsel could have checked the docket to determine if, and when, a judgment had been entered or could have filed a notice of appeal").

 Stewart contends that her failure to submit defendants' films in opposition to defendants' motions for summary judgment was due to her attorney's neglect.[10] It is clear that Stewart's counsel failed to submit the films, perhaps because he misconceived the burden of producing evidence in the summary judgment context or perhaps through sheer carelessness. Generally, counsel s carelessness or ignorance of the law does not constitute excusable neglect. See *Pincay v. Andrews,* 389 F.3d 853, 857 (9th Cir.2004) ("[I]nadvertence, ignorance of the rules, or mistakes construing the rules do hot usually constitute 'excusable' neglect," citing *Pioneer,* 507 U.S. at 392), cert. denied, 544 U.S. 961, 125 S.Ct. 1726, 161 L.Ed.2d 602 (2005); see also, e.g., *Allmerica Financial Life*

---

**10.** Plaintiff's Memorandum of Points and Authorities in Support of Motion for Reconsideration and, Alternatively, for Relief under FRCP 60(b) ("PL's Mem.") at 5, 10; Declaration of Michel T. Stoller in Support of Plaintiff's Motion for Reconsideration and, Alternatively, for Relief under FRCP 60(b) ("Stoller Decl."), ¶ 10.

*Ins. and Annuity Co. v. Llewellyn*, 139 F.3d 664, 665–66 (9th Cir.1997) ("counsel's failure to plead an affirmative defense of waiver in the First Amended Answer does not provide a basis for equitable relief under Rule 60(b)(1)"); *Engleson v. Burlington Northern R.R. Co.*, 972 F.2d 1038, 1043–44 (9th Cir.1992) ("Neither ignorance nor carelessness on the part of the litigant or his attorney provide grounds for relief under Rule 60(b)(1)" (internal quotation omitted)). As *Pincay* observes, however, after *Pioneer*, " 'excusable neglect' ... is a some-what 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pincay*, 389 F.3d at 857 (citing *Pioneer*, 507 U.S. at 392). The Ninth Circuit in *Pincay*, however, recognized that the district court has discretion to determine, in a particular case, whether attorney neglect is excusable or whether it is not. See *id.* at 858 ("[T]here appears to be general agreement on at least one principle: the standard of review. We review for abuse of discretion a district court's decision to grant or deny a motion for an extension of time to file a notice of appeal.... We must affirm unless we are left with the definite and firm conviction that the lower court committed a clear error of judgment in the conclusion it reached after weighing the relevant factors"). The question on appeal, the court stated, is "whether there [is] enough in the context of th[e] case to bring a determination of excusable neglect [or lack thereof] within the district court's discretion." *Id.* at 859. Here, the court determines that "in the context of th[e] case," there is sufficient evidence to conclude that it was not excusable neglect for plaintiff's attorney to fail to submit copies of defendants' films in opposition to defendants' motions for summary judgment. See *id.* (recognizing "that a lawyer's failure to read an applicable rule is one of the least compelling excuses that can be offered"). The court reaches this conclusion

taking into account "whether the lawyer had otherwise been diligent, the propensity of the other side to capitalize on petty mistakes, the quality of representation of the lawyers (in this litigation [with its lengthy] history), and the likelihood of injustice if the [motion for reconsideration is] not allowed." *Id.* As noted, this is a case where Stewart and her various lawyers have missed deadlines, failed to comply with court orders and the Federal Rules of Civil Procedure, and been generally dilatory in prosecuting this litigation. Defendants, for their part, have not exhibited a "propensity to capitalize on petty mistakes"; rather, they agreed to multiple extensions of time for plaintiff to produce documents and appear for deposition prior to the discovery cut-off date. The case has a lengthy history due to plaintiff's failure to effect service in a timely fashion, her multiple substitutions of attorney, and her failure to file pleadings in a timely fashion. The court has no evidence before it that suggests a refusal to grant plaintiff's motion will result in a miscarriage of justice. Accordingly, it concludes that under the facts of this case, the negligence of plaintiff's lawyer is inexcusable, and that plaintiff cannot identify a valid reason for her delay in proffering relevant evidence. This factor, therefore, weighs against granting Stewart's motion for relief from judgment.

### a. Whether The Movant Acted In Good Faith

Defendants do not contend that plaintiff acted in bad faith, and there is no other evidence that plaintiff purposefully neglected to submit the films as evidence. Stated differently, Stewart s failure to proffer the films as evidence in opposition to defendants' motions for summary judgment was not "devious, deliberate, willful, or [in] bad faith ..." *TCI Group Life Ins. Plan*, 244 F.3d at 698; *Bateman*, 231 F.3d

at 1225 ("[T]here is not evidence that he acted with anything less than good faith. His errors resulted from negligence and carelessness, not from deviousness or willfulness"). As a result, this factor weighs in favor of granting Stewart's motion.

### b. Conclusion Regarding *Pioneer* Factors

As evident from the analysis set forth above, two of the four *Pioneer* factors weigh against granting plaintiff's motion for reconsideration. Although Stewart acted in good faith and did not delay in filing her motion for reconsideration, her attorney's failure to submit obvious evidence in opposition to defendants' motion for summary judgment was not excusable neglect, and further delay in this case will prejudice defendants. To the extent that Stewart's motion is properly considered under Rule 60(b), therefore, it is denied.

### C. Plaintiff's Motion For Reconsideration Under Local Rule 7–18

### 1. Legal Standard Governing Motions For Reconsideration Under Local Rule 7–18

In this district, motions for reconsideration are governed by Local Rule 7–18, which states:

"A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument

made in support of or in opposition to the original motion." Ca CD L.R. 7–18.

Whether to grant a motion for reconsideration pursuant to Local Rule 7–18 is a matter within the court's discretion. See *Johnson v. ITT Industries, Inc.*, 41 Fed. Appx. 73, 74 (9th Cir. July 2, 1999) (Unpub.Disp.) (holding that the district court did not abuse its discretion in denying plaintiff's motion for reconsideration because it relied on information known to them at the time their motion for an extension of time to oppose defendant's summary judgment motion was denied, and it was therefore improper under the Local Rules); see also *ACandS*, 5 F.3d at 1263 (reconsideration is appropriate if the movant demonstrates clear error, manifest injustice, newly discovered evidence, or an intervening change in controlling law).

### 2. Whether The Court Should Reconsider Its Summary Judgment Order Under Local Rule 7–18

Stewart does not identify a material factual or legal difference that she could not have discovered with due diligence prior to the date the court decided the motions for summary judgment. Nor does she assert that new facts or law have emerged since the time of the court's decision. Rather, Stewart contends that the court failed to consider material facts before it when it rendered its judgment.

It is true that the court did not consider the content of defendants' films in reaching its decision. The films, however, were not in evidence prior to the time the court granted defendants' motion because plaintiff failed to proffer them as evidence. Consequently, Stewart cannot establish that the court "fail[ed] to consider material facts *presented* to the Court *before* ... decision." Ca CD L.R. 7–18(c) (emphasis added). Under Local Rule 7–18, therefore, the court need not reconsider its entry of judgment for defendants.

## III. CONCLUSION

For the reasons stated, the court denies Stewart's motion for reconsideration.